**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **RAYMOND EDWARD LUMSDEN,** | § | |
| **#2109472** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:20cv713** |
| | § | |
| **DIRECTOR, TDCJ-CID** | § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

*Pro se* Petitioner Raymond Edward Lumsden, an inmate confined in the Texas prison system, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred to United States Magistrate Judge Kimberly C. Priest Johnson for findings of fact, conclusions of law, and recommendations for the disposition of the case pursuant to 28 U.S.C. § 636, and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to the United States Magistrate Judge.

## I. PROCEDURAL BACKGROUND

Petitioner is challenging his Denton County convictions, Cause No. F15-1103-211. On September 19, 2016, a jury found Petitioner guilty of aggravated sexual assault of a child, indecency with a child, and criminal solicitation of a minor. (Dkt. #37-1, p. 181). The jury assessed Petitioner's punishment at confinement for life for each offense, and the trial court ordered the three life sentences to run consecutively. (Dkt. #37-1, pp. 181-82).

Petitioner appealed his convictions, which were affirmed on November 8, 2018. *Lumsden v. State*, 564 S.W.3d 858 (Tex. App. 2018). Petitioner filed a petition for discretionary review ("PDR") (Dkt. #38-5), which the Texas Court of Criminal Appeals ("TCCA") refused on February 13, 2019. *Lumsden v. State*, PDR No. PD-1378-18 (Dkt. #38-7). Petitioner's *pro se* motion for

rehearing (Dkt. #38-6) was dismissed for non-compliance on February 22, 2019. *See Lumsden*, PDR No. PD-1378-18. Petitioner filed a petition for a writ of certiorari in the United States Supreme Court, which was denied on May 13, 2019. *Lumsden v. Texas*, 139 S. Ct. 2018 (2019) (No. 18-8295) (Dkt. #38-1).

Petitioner, with the assistant of counsel, filed an application for state habeas corpus relief on April 27, 2020, and amended it on May 22, 2020. (Dkt. #38-12, pp. 43-63, 166-92). While his state habeas application was pending, Petitioner filed his original federal petition on September 8, 2020.[1] (Dkt. #1). On October 14, 2020, the Court granted Petitioner's motion to stay and abate this case while he awaited the outcome of his state writ of habeas corpus, and the case was administratively closed. (Dkt. ##7, 8).

In November 2020, Petitioner filed motions for postconviction forensic DNA testing in the state court. (Dkt. #37-25, pp. 217-30; Dkt. #37-26, pp. 1-15, 17-181; Dkt. #37-27, pp. 1-39). The trial court denied the motions. (Dkt. #37-30, p. 7). Petitioner filed a *pro se* direct appeal of the trial court's denial of his motions for forensic DNA testing. (Dkt. #37-38). On September 23, 2021, the Second Court of Appeals of Texas affirmed the trial court's denial of postconviction relief. *Lumsden v. State*, No. 02-21-00012-CR, 2021 WL 4319602 (Tex. App. Sept. 23, 2021) (Dkt. #37-36). The TCCA did not take action on Petitioner's subsequent PDR because it was not timely filed. *See Lumsden v. State*, PDR No. PD-0914-21 (Tex. Crim. App. 2021).

On August 12, 2020, the state habeas court adopted the State's Amended Proposed Findings of Fact and Conclusions of Law as its own and recommended Petitioner's application be

---

[1] A *pro se* prisoner's habeas corpus petition is deemed filed, for the purposes of the Antiterrorism and Effective Death Penalty Act of 1996, when the prisoner delivers the papers to prison authorities for mailing. *Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998). Petitioner declared under penalty of perjury that he deposited the petition in the prison mailing system on September 8, 2020. (Dkt. #1, p. 15).

denied. (Dkt. #38-22, pp. 297-315, 353). On June 2, 2021, the TCCA denied the application without a written order on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record. (Dkt. #38-40). On July 1, 2021, this case was returned to the active docket. (Dkt. #12).

On July 12, 2021, the Court granted Petitioner's second motion to stay and abate this case while he filed a petition for a writ of certiorari with the United States Supreme Court, and this case again was administratively closed. (Dkt. ##13, 14). The Supreme Court denied the certiorari petition on October 4, 2021. *Lumsden v. Texas*, 142 S. Ct. 281 (2021) (Dkt. ##17-1, 39-2). On October 15, 2021, Petitioner filed a motion to return this case to the active docket (Dkt. #17) and attached his amended petition (Dkt. #17-2), which is the operative petition in this action. On March 22, 2022, this case was returned to the active docket. (Dkt. #20).

Thereafter, Petitioner filed two *pro se* state habeas applications. (Dkt. #39-5, pp. 45-48; Dkt. #39-6, pp. 1-15; Dkt. #41-4, pp. 5-23). On July 13, 2022, the second state habeas application[2] was denied without written order on the findings of the trial court without hearing and on the TCCA's independent review of the record (Dkt. #41-3), and the third state habeas application was dismissed as a subsequent application on July 20, 2022 (Dkt. #41-7).

In the amended federal petition, Petitioner asserts the following claims for relief:

(1)     Trial counsel provided ineffective assistance by failing to properly request funding for a DNA expert to testify at trial.

(2)     Trial counsel provided ineffective assistance by failing to preserve for appeal objections to speculative testimony.

(3)     Trial counsel provided ineffective assistance by failing to request an instruction to disregard testimony that the victim appeared truthful after the trial court sustained trial counsel's objection for bolstering.

---

[2] In his second state habeas application, Petitioner raised the following sole ground for relief: the State withheld "critical and material *Brady* evidence related to a Deputy involved in the criminal proceedings." (Dkt. #39-6, p. 2).

(4)     Trial counsel provided ineffective assistance by failing to object to the jury seeing Petitioner in custody during trial.

(5)     Trial counsel provided ineffective assistance by failing to introduce Child Protective Services ("CPS") records.

(6)     Trial counsel provided ineffective assistance by failing to introduce exculpatory text messages.

(7)     Trial counsel provided ineffective assistance by failing to discover and call Marion Cashel as a witness to provide mitigating testimony during the punishment phase of trial.

(8)     Cumulative error based on the ineffective assistance of trial counsel, appellate counsel, and state habeas counsel.

(9)     The State violated Petitioner's due process rights and right to a fair trial by bolstering their witnesses' credibility.

(10)    Trial counsel provided ineffective assistance by failing to object to the State's repeated bolstering of its witnesses.

(11)    Trial counsel provided ineffective assistance by failing to hire a forensic psychologist as an expert to refute the victim's testimony.

(12)    Trial counsel provided ineffective assistance by "opening the door" to evidence of Petitioner's prior convictions.

(13)    Trial counsel provided ineffective assistance by failing to hire a medical expert to rebut the testimony of the sexual assault nurse examiner.

(14)    The State convicted Petitioner using false and perjured testimony, violating his right to due process and a fair trial.

(15)    Petitioner is actually innocent because the evidence was insufficient to support his convictions for:
        (a)    aggravated sexual assault of a child;
        (b)    indecency with a child; and
        (c)    criminal solicitation of a minor.

(16)    Trial counsel provided ineffective assistance by failing to both investigate and object to improper surrogate testimony by the State's DNA witness, Christina Capt.

(17)    Petitioner does not have a claim 17.[3]

(18)    Appellate counsel provided ineffective assistance by failing to challenge the court's decision to allow the victim to testify from a place Petitioner could not see her, therefore violating the Confrontation Clause and Petitioner's right to a fair trial.

(19)    Habeas counsel provided ineffective assistance by failing to allege a claim that Petitioner's appellate counsel was ineffective for failing to raise a Confrontation Clause claim.

(20)    The Second Court of Appeals erroneously denied Petitioner's double-jeopardy claim.

(21)    Trial counsel provided ineffective assistance by failing to impeach the false and perjured testimony of the State's witnesses.

(22)    Trial counsel provided ineffective assistance by failing to seek testing of the victim's underwear and re-testing of the victim's swabs to support a theory of "secondary DNA transfer."

(23)    The Second Court of Appeals erred by ruling that Petitioner's substantial rights were not violated when the trial court allowed a forensic video interview of the victim to be played to the jury for a second time.

(24)    The state appellate court's ruling that trial counsel was not cumulatively ineffective conflicts with clearly established Supreme Court precedent.

(25)    The state appellate court erred by ruling that the "numerous abuses of discretion" by the trial court did not cause Petitioner harm.

(26)    The state habeas court and the TCCA erred by adopting the State's findings and conclusions.

(27)    The Second Court of Appeals erred by denying Petitioner's insufficiency of the evidence claims as to his convictions for:
    (a)    aggravated sexual assault of a child;
    (b)    indecency with a child; and
    (c)    criminal solicitation of a minor.

(28)    Trial counsel provided ineffective assistance by failing to discover and call witnesses Dr. Parnell Ryan and Dr. Sheree Gallagher, who could have provided mitigating evidence.

---

[3] Petitioner skips Claim 17 and proceeds to Claim 18. (Dkt. #17-2, pp. 19-20). For the sake of clarity, the Court retains Petitioner's numbering.

(Dkt. #17-2). The Director filed a response, arguing Petitioner's claims are either procedurally defaulted, unexhausted and procedurally defaulted, not cognizable on federal habeas review, or without merit. (Dkt. #42). Petitioner filed a reply. (Dkt. #44).

## II. FACTUAL BACKGROUND

The Second Court of Appeals of Texas set out a recitation of the facts as follows:

### II. Background[1]

[FN1] Because Lumsden challenges the sufficiency of the evidence to support his conviction for criminal solicitation of a minor, which requires the victim's testimony to be corroborated, we set forth the trial testimony by witness.

#### A. The Victim

Allison,[2] who was almost nine years old at the time of the trial, testified that after her mother Kelly started dating Lumsden, they moved in with him. Allison had her own room at Lumsden's house.

[FN2] We use a pseudonym to refer to the complainant, her mother, and all minors. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

On the night in question, Kelly went to bed early because she was not feeling well. Allison's brother David had also gone to bed. Allison stayed up late watching television with Lumsden. At one point, she went upstairs to grab a blanket and a pillow because she was really sleepy. She laid down beside Lumsden, who was sitting on the couch watching television. While Allison was laying on her back on the couch, Lumsden put his pointer finger under her purple and pink monkey pajamas and under her panties and touched her "privates." Allison said that Lumsden touched the outside of her private that she used to pee and that his pointer finger stayed still, which made her "[a] little uncomfortable." Lumsden touched the inside of the part that Allison used to poop. Allison testified that Lumsden wanted her to touch "the thing he went pee with," but she said no. Allison became hungry and asked for red Jell-O, which Lumsden allowed her to have. Afterwards, Lumsden went to bed, and she slept on the couch because she was too tired to go upstairs to her room. Allison testified that the time on the clock reflected that it was midnight.

The next morning, after Kelly came downstairs and woke up Allison, Allison told her that Lumsden had touched her privates. Kelly then took Allison to the police

station, and from there, the police escorted Kelly and Allison to the hospital. Allison told a nurse what Lumsden had done to her and underwent a physical exam.

The following day, Allison recounted the touching to a forensic interviewer at the Children's Advocacy Center. Allison thereafter began seeing a counselor.

## B. The Victim's Mother

Kelly, who was divorced from Allison's father, testified that she moved in with Lumsden in November 2014. On the evening of March 10, 2015,[3] Kelly had a kidney infection, took a muscle relaxer, and went to bed.

> [FN3] Based on other testimony, it appears that the date was March 9, 2015, but we set forth the date Kelly gave during her testimony.

When Kelly went downstairs the next morning, she found Allison asleep on the couch. Kelly testified that finding Allison on the couch was unusual because she had her own bedroom.

Kelly sat down next to Allison on the couch, rubbed her back, and told her that it was time to wake up. Kelly said that Allison opened her eyes "really big" like she was "startled almost," looked at Kelly, and said she was really tired. Kelly asked Allison why she was tired, and she said, "Ray and I had a lot of fun last night." When Kelly asked what they did, Allison replied that it was a secret. Kelly told Allison that she was not to keep secrets from her. Allison said that she could tell Kelly one thing—that she and Lumsden had eaten Jell-O and cookies even though Allison knew that Kelly did not like her to have sugar at night. Kelly told her that it was sometimes okay to have sugar at night.

Kelly asked what Allison and Lumsden had done. At that point, Allison's demeanor completely changed. Kelly explained that Allison "tightened up. She looked down. She looked scared. Something was wrong." Kelly testified that she had never seen Allison act like that. Allison said that she could not tell Kelly the other secret because Lumsden had told her "never ever to tell" and that Kelly would be mad. Kelly then asked Allison, "Did he touch you?" Allison said, "Yes, in two places," and she held up her fingers. Allison told Kelly that Lumsden had touched her "privates" and her bum, and she pointed down whenever she said privates. Kelly asked Allison whether Lumsden had touched her inside or outside her panties, and she said inside. Allison told Kelly that Lumsden had inserted his finger inside her privates and her bum, that he asked her if she liked it, that she said no, and that he said that was what mommy likes. Kelly told Allison, "Baby, you know that wasn't right. You know that was wrong. Right?" Allison said, "[Y]eah." Kelly asked Allison if she had touched Lumsden, and Allison replied, "He asked me if I wanted to, but I said no." Kelly picked up Allison and told her that she was proud of her for telling her what had happened and that they were going to talk to some other adults they could trust.

Once they were in the car, Kelly called 911, and the 911 operator guided her to the sheriff's office. Kelly spoke briefly to two police officers at the Denton County Sheriff's Office. Then, she followed a police officer to the hospital. Kelly testified that she was in the room when a sexual assault nurse examiner (SANE) examined Allison.

While they were at the hospital, Kelly received text messages from Lumsden. She "was really angry" and sent him a text that asked how he could have done this. Lumsden "was really mad" and responded that Allison had blamed her grandpa[4] and her father[5] for "the same things," that she could not be trusted, and that she needed help. Kelly testified that Allison had never told her that her grandpa or her father had touched her inappropriately and that she (Kelly) did not believe Lumsden's texts

> [FN4] Kelly explained that about six weeks prior to the incident, Lumsden had told her in the kitchen one day that Allison had told him "something kind of weird" about a time when her grandpa was tickling her and her panties accidentally showed; she said, "[W]hoops, my panties are showing"; and her grandpa said that was okay. Kelly testified that Lumsden's story "was really weird" to her because Allison never wore dresses without leggings or shorts underneath and so her panties would not have shown. Lumsden was upset and wanted her to be upset and to call CPS, but Kelly told him that she would talk to Allison about the incident even though she was "sure it's nothing." When Kelly asked Allison if her grandpa had ever made her feel uncomfortable, she had nothing to say other than that he is silly.

> [FN5] Kelly testified that one night—a couple of weeks before the incident—when she was giving Allison a bath, Lumsden had questioned her about who bathed Allison at her father's house. Kelly told him that Allison washes herself but that her father probably helped her with her hair. Kelly testified that Lumsden was bothered by this and said that it was inappropriate. Kelly told Lumsden that she would work with Allison on washing her own hair. After Kelly spoke with Allison, Kelly did not think that Allison's father was doing anything inappropriate.

.
The following day, Allison's father took her to the Children's Advocacy Center, and Kelly met them there. Kelly moved out of Lumsden's house.

## C. The Victim's Half-Brother

Kelly's son David testified that his mother had previously dated Lumsden, and David identified Lumsden in the courtroom. David said that on the night in

question, he was at Lumsden's house with Kelly, Lumsden, and Allison. David testified that he had school the next day but that Allison did not because she attended school in a different school district. David recalled that Lumsden had given Kelly some medicine because she was not feeling well and that she went to bed. David testified that he, Allison, and Lumsden had watched television for a while but that he had gone to bed about 9:30. David heard Lumsden tell Allison that she could stay up as long as she wanted because she did not have school the next day. When David went to bed, Allison and Lumsden were sitting next to each other on the couch.

The next morning when David went downstairs to eat breakfast, he saw Allison sleeping on the couch with a blanket over her. When he left for school, Allison was still asleep.

While David was at school, the receptionist notified him that his mom was going to be late because she was at the hospital. When Kelly eventually picked up David, they went to Lumsden's house, and he packed a bag. After they left, Kelly received a call, and they returned to Lumsden's house, which had police cars everywhere. David said that they went to a shelter that night. David did not recall Allison ever telling him about her grandpa or her father touching her inappropriately.

### D. Denton County Sheriff Deputies Gilberto Velo and Maurice Floyd (the deputies)[6]

> [FN6] Because the two deputies worked together and provided similar testimony, we summarize their testimony together.

Deputy Gilberto Velo with the Denton County Sheriff's Office testified that he and Deputy Maurice Floyd were dispatched to the patrol office on the morning of March 10, 2015, in response to a sexual assault call report. The deputies spoke with Kelly, who appeared to be shocked and in disbelief as she was talking. Deputy Velo said that Kelly teared up as she explained what Allison had told her had occurred the night before.

Deputy Floyd recalled that Kelly

> began to unfold to us verbally what her daughter stated to her about secrets, plural, and her comment as I recall, she says, well, honey, you know, momma has always told you we don't keep secrets. And then her mother said, well, I need to know what those secrets are. And from what I call -- recall, she stated that her daughter stated to her that the secrets involved Jell[-O], that she would be rewarded, so to speak, Jell[-O] for, number one, keeping quiet about what the secret was about and then, number two, the mother began to elaborate on the fact that she had been touched in a -- her private area and that she wasn't -- she had been told, now, don't tell

anybody. Don't say anything to mommy about this because basically momma does -- does this too to me, that being the actor.

Neither Deputy Velo nor Deputy Floyd interviewed Allison that day. Allison was not in the room while the deputies spoke with Kelly. Afterwards, Deputy Floyd spoke with one of the investigators, who advised him that Allison needed to be seen by a SANE at Denton Regional Medical Center.

Kelly and Allison then followed the deputies to Denton Regional Medical Center. The deputies contacted Child Protective Services to make them aware of the report they had taken. Once the investigators arrived at the hospital, the deputies left.

### E. Investigator John Schofield

John Schofield, an investigator with the Denton County Sheriff's Office, testified that he went to Denton Regional Medical Center on March 10, 2015, and obtained a box from a SANE and placed it in evidence at the sheriff's office. Later that evening, Schofield assisted warrant deputies by watching for Lumsden's vehicle because a warrant had been issued for his arrest. Schofield spotted the vehicle and went toward the area where Lumsden's residence was located but was alerted that he had been arrested.

### F. The SANE

Nurse Julie Carriker, a registered nurse who worked part-time as a SANE for Denton County, testified that when she spoke with Allison at Denton Regional Medical Center, the first thing she asked her was if she knew why she was there. Nurse Carriker testified that Allison told her the following:

> So she told me that Ray touched her private part or her privates. She said that he did it all the time. She said that she didn't know why, but that it had happened again the previous night. And she told me that she was in the living room, that he had turned the TV off[,] and [that] he [had] touched her kidney parts was what she called it. And so I said, can you point to where that is? And she pointed to her vaginal area.

> Then she said the second time that he touched her, he touched her butt[,] and he put his hands in her pajamas. And she would say that he swirled his hand around, and she said[,] "Here," and then she pointed again to that -- to the vaginal area.

> She said that he kept pushing his finger into her butt and that he always swirled it around and it hurt her. She also said that he touched his pee part, and she pointed to the area -- the groin area. And she said he was swirling his pee part around playing with it. She

10

mentioned that he kissed her on the lips, and she said that he does it all the time and that he wanted her to touch his private parts but she said no.

After obtaining Allison's history, Nurse Carriker performed a head-to-toe exam of Allison, looking for any signs of trauma. Nurse Carriker testified that she performed Allison's physical exam at 2:00 p.m. on March 11, 2015,[7] which was approximately fourteen hours after the incident. Nurse Carriker explained that during the exam, she noted "generalized redness" that covered Allison's vaginal area and a tear or a cut "barely inside the anal opening at about 7:00." Nurse Carriker testified that the redness on Allison's vagina was consistent with Allison's statement that Lumsden had put his finger there and had swirled it around. Nurse Carriker documented in her report that Allison's anus dilated quickly, and she explained that she sees that "in abuse cases." Nurse Carriker testified that the tear in Allison's anus was consistent with Allison's statement that Lumsden had inserted his finger in her bottom. Allison told Nurse Carriker that the tear in her anus bothered her. Nurse Carriker swabbed Allison's mouth, vagina, anus, and fingernail area and combed through her hair to collect biological evidence.

> [FN7] Based on other testimony, it appears that the date was March 10, 2015, but we set forth the date Nurse Carriker gave during her testimony.

### G. The Forensic Interviewer

Priscilla Alvarado, who serves as a family services coordinator at the Children's Advocacy Center for Denton County, testified that during her forensic interview with Allison on March 11, 2015, she said that her mom's boyfriend Lumsden had "done this to her." Alvarado testified that Allison provided sensory details and peripheral details when she explained what had happened to her. The video of the forensic interview was played for the jury.

During the forensic interview, Allison said that she was seven years old and that she was there because "my friend Ray [whom she identified as her mother's boyfriend] keeps touching my privates, and I don't know why." Allison told Alvarado that Lumsden had touched her more than one time, that she could not remember the first time, but that it had occurred when she was seven years old. Allison later told Alvarado that Lumsden had touched her four times, that one time he only touched her pee part, and that the other times "were kind of like the same thing."

Allison told Alvarado about a recent touching. Allison said that after she took a bath, she went downstairs to be with Lumsden. She said that she was wearing her Monkey Junior pajamas and rainbow panties and that Lumsden was wearing a dark blue shirt and gray pants. After her half-brother David went to bed, she went upstairs to grab toys and a pillow so that she could sleep on the couch. Allison said

that Lumsden was sitting at the very end of the couch and that she was laying on him on her back "to get really cozy." Allison explained that it was midnight and that Lumsden touched her "privates," which she explained was her term for the body parts that she used to go to the bathroom. Allison said that Lumsden touched her under her clothes with his fingers and that he was "wobbling" and kept "wiggling" his fingers. Allison told Alvarado that Lumsden had put his finger in her butt "really, really deep" and that it had made her feel "weird" and "disgusting" and "embarrassed." Allison said that she told Lumsden to stop. Allison said that Lumsden asked her to touch his pee part, but she told him no. Allison told Alvarado that Lumsden "tells me he always touches [Mom's] butt and pee spot." Allison said that Lumsden also told her not to tell anyone and specifically not to tell her mother. Lumsden then gave her red Jell-O, which she said was her favorite. Allison told Alvarado that this kind of touching had not happened with anyone else before.

### H. Lumsden's Son's Friend

Elliott, who was in eighth grade, testified that he was friends with Lumsden's son John. After Lumsden bonded out of jail on these offenses, Elliott received a call from a man named Troy who lived at Lumsden's house and was allegedly John's uncle. Troy told Elliott to tell John that "if they ever asked questions," he should say that when Allison was in the kitchen doing cartwheels, her "grandpa was doing stuff that he shouldn't have been doing."

### I. Investigator Ashleigh Berg

Ashleigh Berg, an investigator with the Denton County Sheriff's Office, testified that she went to Lumsden's residence on March 10, 2015, to execute a search warrant. Berg found blankets and a pillow on the couch, which looked like it "was made up into a bed," and were consistent with Allison's statement. Berg also found an empty serving cup of Jell-O on the top of the trash can in the pantry in the kitchen and the pull-off lid was on the countertop in the kitchen, which she testified was consistent with Allison's statement. Berg photographed the Jell-O container and the couch. Lumsden was at the residence during the search and gave Berg permission to take photographs of text messages on his phone.

### J. Investigator Marco Deleon

Marco Deleon, who previously worked in criminal investigations with the Denton County Sheriff's Office, testified that on March 10, 2015, he met with Kelly when she brought Allison to the sheriff's office. Deleon described Kelly as "very distraught, very self-blaming." After hearing Kelly describe what had happened to Allison, Deleon made the decision that they should move forward immediately with a sexual assault exam by a SANE at the hospital because he estimated that only twelve to fourteen hours had passed since the alleged sexual assault had occurred.

Deleon testified that afterwards, he met with Nurse Carriker and reviewed her report, which indicated that Allison had a tear in her anus that was consistent with a fingernail; that her anus dilated very quickly, indicating that it had been recently penetrated; and that she had redness in her vaginal area. Based on Nurse Carriker's findings during Allison's physical exam, Deleon obtained an arrest warrant for Lumsden, which was executed at his residence when he arrived home from work.

Upon arrest, Lumsden wanted Deleon to look at the text messages between him and Kelly. Deleon described Lumsden's text messages to Kelly as setting the stage to show that someone else was responsible for the sexual assault of Allison. During the search of Lumsden's residence, Lumsden pointed out some legal paperwork that he felt was relevant to show that he was not responsible. Deleon collected the paperwork but did not find Lumsden's defense to be valid. Deleon testified that when he looked into Lumsden's statements that Allison's grandpa or her father had inappropriately touched her, Deleon found that Lumsden was the root of those statements.

Deleon testified that the day following Lumsden's arrest, he (Deleon) watched Allison's forensic interview from a room that was adjoined to the interview room. Deleon said that Allison provided "a lot of details" that they did not know when they executed the search warrant on Lumsden's home. Deleon said that Allison described the clothing she had on during the sexual assault—monkey pajamas and rainbow panties—and the color of the pants and shirt that Lumsden had been wearing. Deleon said that Allison described laying on the sofa with Lumsden and getting cozy with him before the sexual assault occurred. Deleon testified that the statements Allison made during the forensic interview were corroborated by the evidence found at Lumsden's residence and by the findings of the sexual assault examination. Deleon took buccal swabs of Lumsden's mouth to obtain his DNA.

Deleon spoke with Kelly again after Allison's forensic interview. Kelly told Deleon about the background of Lumsden's relationship toward children, which reflected preplanning and grooming. Kelly also gave Deleon a box of items.

During the investigation, Kelly told Deleon that she was concerned about a blog called Topics that discussed Kelly and Allison and mentioned paying Kelly some money to make the case go away and to prevent Allison from having to testify in court. Deleon traced several of the usernames that posted about Kelly and Allison and built up Lumsden's character back to a single source—Lumsden's cell phone.

Also during the investigation, Deleon was made aware that people were receiving phone calls that were trying to interfere with the investigation. Troy told Deleon that Lumsden was using his (Troy's) name and calling people. Troy was ultimately ruled out as the person who was making the phone calls.

### K. Lumsden's Son

John, who is Lumsden's son, testified that he was not at his dad's house when the events at issue transpired. John said that Allison never told him anything about her grandpa or her father touching her inappropriately. John testified that Allison never touched him inappropriately.

### L. Forensic DNA Analyst

Christina Capt, who is a technical leader and a forensic DNA analyst with the University of North Texas Center for Human Identification, testified that the vaginal swabs that had been taken from Allison were used to develop an unknown Y STR profile. The buccal swabs from Lumsden were used to develop a known Y STR profile. Capt explained that the profile developed for Lumsden was compared to the profile from Allison's vaginal swab, and "at all nine locations where we obtained data for the vaginal swab, there was an exact match with the alleles detected in Raymond Lumsden's profile." Capt testified that she was thus not able to exclude Lumsden from being a contributor to the unknown Y STR profile found in Allison's vaginal swabs. Capt further testified that six out of 10,000 people would have the same nine markers that were located in this case and that no other male contributors were detected on any of the items that were tested.

### M. Lumsden

Lumsden took the stand during the defense's case in chief. Lumsden testified that when he was sixteen years old, he was convicted of fifth-degree burglary in Minnesota and was sentenced to adult prison. While Lumsden was in prison, he saw Troy, whom he had seen before at family get-togethers and understood that he was a relative. Lumsden later learned from his mother that Troy was a cousin on his father's side.[8] Lumsden said that Troy protected him while he was in prison. Because Lumsden felt a debt of gratitude toward Troy, Lumsden housed and fed him once they were released from prison.

> [FN8] Lumsden's ex-wife Amanda testified that Troy was not related to Lumsden in any way and that he was simply a friend.

Lumsden testified that due to the kids being home for spring break and Kelly being sick, he had asked Troy to come help out with his kids. Lumsden said that on the night in question, Kelly was in bed when he came home from work, Allison was watching television, and David was playing video games. Lumsden testified that he gave Allison red Jell-O between 8:00 and 9:00 p.m.

Lumsden went upstairs and put on a pair of gray sweatpants and a blue shirt. Lumsden said that when he came downstairs, he finished some work and then sat on the couch and watched television with Allison. Lumsden testified that David went to bed about 10:15 p.m. and that he went to bed around 10:30 p.m. after

14

locking the front door and setting the alarm. Lumsden agreed that he was alone on the couch with Allison for a period of time.

Lumsden said that when he went upstairs to go to bed, Allison was already asleep on the couch. He woke up Kelly and told her that Allison was sleeping on the couch downstairs, and Kelly said that Allison was supposed to be sleeping in her own room. Lumsden said that Kelly went downstairs and dealt with Allison around 10:45 or 11:00 p.m. Lumsden testified that he did not go downstairs in the middle of the night and assault Allison.

When Lumsden went downstairs the next morning, Allison was sitting on the couch eating cereal that David had prepared for her. Lumsden said that he and Kelly had a very explosive fight that morning and that Allison was crying when he left for work. When Kelly sent Lumsden text messages later that morning accusing him of sexually assaulting Allison, he knew that he had not sexually assaulted Allison and told Kelly that she needed to look at Allison's grandpa and father as possible suspects.

Lumsden also considered the possibility that Troy could have been a suspect but did not know if he would do something like that. Lumsden said that Troy had a set of keys to the house and had previously stayed in the room that Allison used as her bedroom. Lumsden testified that it was possible that Troy came in the middle of the night, tried to sleep on the couch, assaulted Allison, and then left. Lumsden testified that the only thing Allison had ever said about Troy was that he had tickled her; Lumsden had never heard any allegations about Troy.

Lumsden admitted that he could not explain the DNA evidence. Lumsden testified that his son John did not sexually assault Allison and that none of his other patrilineal relatives were in his home on the night in question.

Lumsden gave a statement to Deleon when he was arrested. When confronted with the statement he gave at that time, which said that Kelly was sick downstairs with Allison and David when he got home from work around 9:00 p.m., Lumsden said it was possible that he had previously said that. Lumsden did not recall telling Deleon that Kelly went to bed fifteen minutes before Lumsden went to bed.

Lumsden recalled that he had given a statement to someone at Child Protective Services. The prosecutor recounted that Lumsden had told CPS that Kelly was in bed when he got home at 9:00; that she got out of bed, ate, and was groggy; that he and David went to bed; and that Allison was downstairs on the couch. Lumsden testified that was the exact same thing that he had told Deleon, except the fact that she got up and ate. Lumsden testified that he did not really know what he had told Deleon because he had guns pointed at his face, but he recalled telling Deleon specifically that Kelly was in bed when he got home and that she had been in bed all day because she was sick and taking pills that had been prescribed to her.

When confronted with the letter that he had written to his ex-wife Lindsey, whom he had told that he and David had gone upstairs together at 10:30 p.m. on the night in question, Lumsden explained that there was maybe a fifteen-minute gap between the time that he and David went to bed that night.

Lumsden agreed that in the statements he had made to Deleon, the CPS worker, and Lindsey, he had said that at some point, there was a room full of people—including John, David, Elliott, and Kelly—and that Allison had made allegations against her grandpa and her father. When confronted with David, Elliott, and John's trial testimony that Allison had never made that allegation, Lumsden said that maybe they did not hear her say it or did not remember that she had said it.

On cross-examination, Lumsden did not contest the fact that Allison had been sexually assaulted on or about March 10, 2015; that the only people in his home on the night in question were Kelly, Allison, David, and Lumsden; and that there was no testimony that Troy was anywhere near Lumsden's home on the night in question.

**N. Rebuttal Witnesses**

During rebuttal, the State called three of Lumsden's ex-wives, his daughter Anna, Kelly, an employee of the Denton probation department, Deleon, and a Flower Mound police officer—all of whom expressed their opinions that Lumsden was untruthful.

*Lumsden*, 564 S.W.3d at 866-74.

### III.  STANDARD FOR FEDERAL HABEAS CORPUS RELIEF

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993); *Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The new provisions of § 2254(d) provide that an application for a writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) was contrary to federal law then clearly established in the holdings of the Supreme Court; (2) involved an unreasonable application of clearly established Supreme Court precedent; or (3) was based on an unreasonable determination of the facts in light of the record before the state court. *See Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).

The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Furthermore, a state court's factual findings are entitled to deference and are presumed correct unless the petitioner rebuts those findings with clear and convincing evidence. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010); *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006); *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001); *see also Moore*, 313 F.3d at 881 (the statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts). This deference extends not only to express findings of fact, but also to any implicit findings of the state court. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005)). Where, as here, "the state habeas court and trial court are one in the same," the presumption of correctness afforded the state habeas court's factual determinations is "especially strong." *Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (citations omitted).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Brown v. Payton*,

544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A federal court's review of a decision based on the "unreasonable application" test should only review the "state court's 'decision' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, that application must be objectively unreasonable. *Id.* at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the decision. *Richter*, 562 U.S. at 87 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

"In Texas writ jurisprudence, usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a claim." *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *see also Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits). Thus, a state application that is denied without written order by the TCCA, as in the present case, is an adjudication on the merits. *See Singleton*, 178 F.3d at 384; *Ex parte Torres*, 943 S.W.2d at 472. Where the decision is a summary denial or affirmance, however, a "federal [habeas]

court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning."[4] *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

In addition to the standard of review imposed by the AEDPA, the petitioner must also show that any constitutional error had a "substantial and injurious effect or influence" on the verdict to be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Supreme Court explained that, while the passage of the AEDPA "announced certain new conditions to [habeas] relief," it did not supersede or replace the harmless error standard announced in *Brecht*. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas petitioner must also satisfy *Brecht*, even if the AEDPA applies. *See id.* ("[A] federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests.") (emphasis in original).

Additionally, federal habeas relief is foreclosed if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); or (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989).

Thus, the federal writ serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

---

[4] The Director may rebut this presumption by showing that the most recent state court's unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were argued or supported by the record that the state court reviewed. *See Wilson*, 584 U.S. at 125-26; *Wesson v. Dir., TDCJ-CID*, No. 1:19-CV-00187-H, 2022 WL 3928513, at *3 (N.D. Tex. Aug. 30, 2022), *appeal dismissed sub nom. Wesson v. Lumpkin*, No. 22-10990, 2023 WL 2881423 (5th Cir. Mar. 10, 2023).

# IV.  ANALYSIS

## A. **Procedural Default (Claim 14)**

In Claim 14, Petitioner argues the State convicted him using false and perjured testimony, in violation of his right to due process and a fair trial. (Dkt. #17-2, p. 19). The Director argues Claim 14 is procedurally barred from federal habeas review. (Dkt. #42, pp. 9-10). The Court agrees.

Petitioner raised Claim 14 for the first time in his third state habeas application (Dkt. #41-4, pp. 12, 37-38), which was dismissed as a subsequent application pursuant to the Texas abuse of writ doctrine, codified in Tex. Code. Crim. Proc. art. 11.07, § 4. (Dkt. #41-7). Under the procedural default doctrine, federal courts are precluded from granting habeas relief where the last state court to consider the claims raised by the petitioner expressly and unambiguously based its denial of relief on an independent and adequate state law procedural ground. *Coleman*, 501 U.S. at 729-30; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). The Fifth Circuit has ruled that the Texas courts' application of the abuse of writ doctrine under art. 11.07, § 4 is an adequate, independent state ground barring federal habeas review. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).

The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Coleman*, 501 U.S. at 750; *Gonzales v. Davis*, 924 F.3d 236, 241-42 (5th Cir. 2019). To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The mere fact that a petitioner or his counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. *Id.* at 486. In *Martinez v. Ryan*,

566 U.S. 1, 16-18 (2012), the Supreme Court carved out a narrow exception to the procedural default rule only for claims of ineffective assistance of trial counsel when post-conviction review is the first time a petitioner can bring such claims, and petitioner had either ineffective collateral review counsel or no counsel at all.

Petitioner's reliance on *Martinez* and *Trevino v. Thaler*, 569 U.S. 413 (2013), to overcome the procedural default of his due process claim is misplaced. "*Trevino* permits a Texas prisoner to overcome the failure to raise a substantial ineffective-assistance claim in state court by showing that state habeas counsel was ineffective." *Ayestas v. Davis*, 584 U.S. 28, 45-46 (2018) (citing *Trevino*, 569 U.S. at 429). *Trevino*, however, does not permit a Texas prisoner to overcome the failure to raise non- ineffective-assistance-of-trial-counsel-claims in state court. *See, e.g.*, *Murphy v. Davis*, 732 F. App'x 249, 256-57 (5th Cir. 2018) ("Under *Martinez* and *Trevino*, the ineffectiveness of state habeas counsel may excuse a petitioner's procedural default 'of a single claim'—ineffective assistance of trial counsel. We are also bound by our past pronouncements that *Martinez* and *Trevino* apply 'only' to ineffective assistance of trial counsel claims." (internal citation omitted)); *Speer v. Stephens*, 781 F.3d 784, 785 (5th Cir. 2015). The Supreme Court in *Davila v. Davis*, 582 U.S. 521 (2017), declined to extend *Martinez* and *Trevino* beyond ineffective-assistance-of-trial-counsel-claims, calling the exception "'narrow,' 'highly circumscribed,' and available only in 'limited circumstances.'" *Id.* at 530. *Martinez* cannot excuse the default of a non-ineffective-assistance-of-trial-counsel-claim. *Davila*, 582 U.S. at 530-31.

Because Petitioner has not satisfied the "cause and prejudice" test, the Court must determine whether the application of the procedural bar would result in a fundamental miscarriage of justice. A petitioner makes such a showing only if he establishes as a factual matter that he is "actually innocent" of the crime of conviction. *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995);

*McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001); *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999). The record contains nothing that suggests Petitioner's actual innocence on the underlying conviction. Petitioner did not, and cannot, allege a sufficient basis to overcome the procedural bar of his due process claim. Thus, Claim 14 is procedurally barred and does not warrant federal habeas review.

## B.  Exhaustion and Procedural Default

The Director also argues several claims are unexhausted and procedurally barred from federal habeas review. (Dkt. #42, pp. 10-15).

A prisoner must exhaust all remedies available in state court before proceeding in federal court unless circumstances exist that render the state corrective process ineffective to protect the prisoner's rights. 28 U.S.C. §§ 2254(b), (c). To exhaust properly, Petitioner must "fairly present" all of his claims to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). This means that a petitioner must have informed the state court system of the same facts and legal theories upon which he bases his assertions in his federal habeas petition. *Id.* at 276-77; *Dispensa v. Lynaugh*, 847 F.2d 211, 217-18 (5th Cir. 1988). "The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court." *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (internal quotation marks and citations omitted). In Texas, all claims must be presented to and ruled on by the TCCA. *Richardson v. Procunier*, 762 F.2d 429, 430-31 (5th Cir. 1985); *Deters v. Collins*, 985 F.2d 789 (5th Cir. 1993). A Texas prisoner satisfies the exhaustion requirement when the substance of the federal claims have been fairly presented to the state's highest court by filing either (1) a direct appeal followed, if necessary, by a petition for discretionary review in the TCCA; or (2) a state petition for writ of habeas corpus pursuant to Article 11.07 of the Texas Code of Criminal Procedure. *Sones v. Hargett*, 61 F.3d 410, 414-15

(5th Cir. 1995); *Richardson*, 762 F.2d at 430-32; *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). "Habeas petitioners must exhaust state remedies by pursuing their claims through one complete cycle of either state direct appeal or post-conviction collateral proceedings." *Busby v. Dretke*, 359 F.3d 708, 723 (5th Cir. 2004).

A review of Petitioner's state proceedings reveals the Director is correct that Petitioner did not fairly and properly present Claims 9-13,[5] 15(a)-(b), 16, 18, 20-22, 25, 27(a)-(b), and 28 to the highest state court in a procedurally correct manner. Petitioner failed to raise these claims on either direct appeal and the PDR or in his first state habeas application. Therefore, the TCCA has not had an opportunity to review Petitioner's claims. Accordingly, Petitioner's Claims 9-13, 15(a)-(b), 16, 18, 20-22, 25, 27(a)-(b), and 28 are unexhausted.

If a petitioner has failed to exhaust state court remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, the claims are procedurally defaulted for purposes of federal habeas review. *Coleman*, 501 U.S. at 735, n.1; *see also Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). If Petitioner presented his unexhausted claims at this time to the TCCA in another state writ application, the court would find them to be procedurally barred under the Texas abuse of the writ doctrine. Tex. Code Crim. Proc. Ann. art. 11.07 § 4; *Ex parte Whiteside*, 12 S.W.3d 819, 821 (Tex. Crim. App. 2000). Thus, these claims are barred from federal habeas review under the federal procedural default doctrine. *See Fearance*, 56 F.3d at 642 (the Texas abuse of the writ doctrine is an "independent and adequate" state procedural bar for purposes of federal habeas review); *see*

---

[5] Petitioner did not raise Claim 13 in his first state habeas application; rather, he raised the claim in a *pro se* motion to supplement/amend his first state habeas application, which he filed after the state habeas court had already adopted the State's proposed findings and conclusions and the record had been forwarded to the TCCA but before the TCCA denied the application. (Dkt. #38-36). On March 4, 2021, before the TCCA denied Petitioner's first habeas application, the TCCA dismissed Petitioner's motion to supplement/amend. (Dkt. #38-36). Thus, Petitioner did not fairly present Claim 13 to the TCCA.

*also Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review.") (quoting *Coleman v. Quaterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007)).

Petitioner fails to overcome the procedural bar by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the Court's refusal to consider the claims. *See Murray*, 477 U.S. at 488; *Finley*, 243 F.3d at 220; *Fearance*, 56 F.3d at 642. For the reasons discussed more fully above, Petitioner's reliance on *Martinez* and *Trevino* to overcome the procedural default of his non-ineffective-assistance-of-trial-counsel-claims (Claims 9, 15(a)-(b), 18, 20, and 25, 27(a)-(b)) is misplaced. *See Davila*, 582 U.S. at 530-31. Thus, these claims are procedurally barred and do not warrant federal habeas review.

The remainder of Petitioner's unexhausted claims (Claims 10-13, 16, 21-22, and 28) allege ineffective assistance of trial counsel. The applicability of *Martinez* is conditioned upon Petitioner showing the ineffective-assistance-of-trial-counsel claim is "a substantial one," insofar as having "some merit." *Martinez*, 566 U.S. at 14. Petitioner has not met that burden. In fact, Petitioner has provided the Court with nothing more than conclusory allegations in his amended petition to demonstrate that his claims have merit. A petitioner may not achieve habeas relief by solely making vague or conclusory allegations of ineffective assistance of counsel. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding that in the absence of a specific showing of how counsel's alleged errors and omissions were constitutionally deficient, and how they prejudiced the petitioner, the court can find no merit to the ineffective assistance of counsel claims). Petitioner has not established a meritorious ineffective-assistance-of-trial-counsel claim because he has failed to show how trial counsel's alleged errors prejudiced his defense. Thus, he cannot rely on the *Martinez* exception to excuse the procedural default at issue. Finally, Petitioner has not

24

presented new evidence of actual innocence or that a fundamental miscarriage of justice would occur if the Court does not review the merits of the claims.

## C.  Ineffective Assistance of Counsel

Petitioner's asserts numerous ineffective assistance of counsel claims. A petitioner who seeks to overturn his conviction on the grounds of ineffective assistance of counsel must prove entitlement to relief by a preponderance of the evidence. *James v. Cain*, 56 F.3d 662, 667 (5th Cir. 1995). Ineffective assistance of counsel claims are governed by the Supreme Court's standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides a two-pronged standard, and the petitioner bears the burden of proving both prongs. *Id.* at 687.

Under the first *Strickland* prong, the petitioner must show counsel's performance was deficient. *Id.* To establish deficient performance, he must show "counsel's representation fell below an objective standard of reasonableness," with reasonableness examined under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. The *Strickland* court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight . . . .

*Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted).

Under the second prong of the *Strickland* test, the petitioner must show his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

In addition to applying the *Strickland* two-prong test, a federal habeas court must review a state petitioner's ineffective assistance of counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). Reviewing Petitioner's ineffective assistance of counsel claim through the lens of the AEDPA means that he has a higher bar to exceed in order to prevail. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). Moreover, unreasonableness under *Strickland* and under § 2254(d) are not the same. First, "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* Second, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The Court must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556

26

U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

Furthermore, a petitioner's allegations of ineffective assistance of counsel must be supported by the record. *United States v. Johnson*, 679 F.2d 54, 58-59 (5th Cir. 1982). Even when liberally construing *pro se* pleadings, "mere conclusory allegations on a critical issue . . . are insufficient to raise a constitutional issue." *Black v. Davis*, 902 F.3d 541, 547 (5th Cir. 2018) (citation omitted). More specifically, conclusory statements are insufficient to sustain a claim of ineffectiveness. *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001); *see also Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue.").

### 1.    Failure to Properly Request Funding for DNA Expert (Claim 1)

Petitioner contends trial counsel provided ineffective assistance by failing to properly request funding for DNA expert Suzanna Ryan to testify at trial. (Dkt. #17-2, p. 5). As part of this claim, Petitioner argues trial counsel's failure to file an *Ake*[6] motion caused Petitioner to forfeit his *Ake* claim on appeal. *See Lumsden*, 564 S.W.3d at 879-80.

The background for this claim is set out in the Second Court of Appeals' opinion on direct appeal:

> In July 2016, Lumsden filed a motion for approval of funds for experts and requested $6,000. The trial court approved $3,000 for the services of experts without prejudice to additional requests if necessary. Although Lumsden filed

---

[6] *Ake v. Oklahoma*, 470 U.S. 68 (1985). Due process requires that a defendant have access to the "raw material integral to the building of an effective defense." *Rey v. State*, 897 S.W.2d 333, 337 (Tex. Crim. App. 1995) (citing *Ake*, 470 U.S. at 77). *Ake* required that the defendant be provided a psychiatric expert because the defendant demonstrated that his mental condition would be a "significant factor at trial." 470 U.S. at 83. *Rey* held that *Ake* is not limited to psychiatric experts but applies whenever an indigent defendant establishes a "substantial need for an expert, without which the fundamental fairness of his trial will be called into question." *Rey*, 897 S.W.2d at 338; *see also Calhoun v. Dir., TDCJ-CID*, No. 6:22CV077, 2023 WL 3671887, at *3 (E.D. Tex. Apr. 3, 2023), *report and recommendation adopted*, No. 6:22-CV-00077, 2023 WL 3664808 (E.D. Tex. May 25, 2023).

motions after this requesting funds for investigators, he did not file any other written motions requesting funds for expert witnesses.

At the pretrial hearing on September 2, 2016, Lumsden made an oral request for the trial court to grant an additional $1,500 for a DNA expert to travel from California to be present at the trial. When the trial court inquired whether there were any experts that Lumsden could hire from Texas to avoid an additional out-of-state fee, Lumsden's counsel responded that there were "plenty of experts I could have hired" but that Lumsden had "specifically demanded that we hire this specific expert from California." The trial court stated that it was not going to make a dispositive ruling on Lumsden's oral motion but would take the matter under advisement. The record does not show that the trial court ever ruled on Lumsden's oral request for expert funds.

The clerk's record contains a handwritten letter addressed to the judge and dated September 14, 2016,[10] but filed September 23, 2016.[11] In the letter, Lumsden states that his attorney "refuses to enter the DNA report of our court[-]approved expert, and he failed to have her here to testify. . . . Being indigent, I needed her here, but my lawyer said that you repeatedly denied providing funds to her travel expenses!?" Lumsden also raised this issue in his motion for new trial.

> [FN10] This date falls in the middle of the guilt-innocence phase, which began on September 13, 2016, and completed on September 15, 2016.

> [FN11] The punishment phase concluded on September 19, 2016.

*Lumsden*, 564 S.W.3d at 879-80.

On direct appeal, Petitioner argued the trial court reversibly erred by refusing to give prior approval for expenses related to expert testimony that Petitioner incurred in the presentation of his defense. *Id.* at 879. The Second Court of Appeals overruled the issue because Petitioner "forfeited consideration of his *Ake* claim on appeal by failing to file a proper written *Ake* motion in the trial court." *Id.* at 880. Specifically, the Second Court of Appeals noted "the record demonstrates that Lumsden did not file a proper pretrial motion with the appropriate affidavits or other evidence supporting his request for funding to pay for a DNA expert." *Id.*

Petitioner attached Ms. Ryan's report to his third postconviction motion for DNA testing. *See Lumsden*, No. 02-21-00012-CR, 2021 WL 4319602, at *3. Ms. Ryan re-analyzed the victim's

vaginal swabs and anal swabs after the State's DNA expert Christina Capt had tested the swabs.

Ms. Ryan's report included findings similar to the State's DNA expert:

> No male DNA results were obtained from the amplification of the anal swab sample. In fact, no male DNA at all was detected during the quantitation stage of analysis. The male quantitation system in use at the UNT laboratory is quite sensitive - capable of detecting the DNA from about 3 or 4 cells' worth of DNA, yet no male DNA was detected from this sample.
>
> . . . A low-level, partial, male profile has been detected in the vaginal swab sample. Re-analysis of the data at a lower analytical threshold than used by the UNT laboratory reveals the possible presence of more than one male individual . . . . However, a major male profile is present[,] and this profile is consistent with Mr. Lumsden and with any paternally related male individual.

Ms. Ryan also opined in her report about the possibility of secondary DNA transfers:

> 4. The amount of male DNA detected on what has been labeled as the vaginal swab is very low level[,] and there is no way to determine, through DNA testing, whether the DNA was deposited via a direct contact or through an indirect (secondary) transfer. Considering that [Allison] and Mr. Lumsden [had been] residing in the home together for several months[,] there are many ways in which the DNA located in [Allison's] vaginal area could have transferred here.
>
> It is known that DNA can transfer from person to person or from person to object through a direct contact. The amount of DNA that can transfer through direct contact varies from person to person but can range from no detectable DNA all the way up to 160 nanograms (Kamphausen) or 169 ng (Daty *et al.*). It has also been illustrated through various peer-reviewed journal articles (Cale *et al.*, for example) that DNA can transfer secondarily, through an intermediary. This can be from person to person to object or from person to object to person. An example would include the transfer of Person A's DNA to Person B's hands through a hug or handshake (direct transfer). Person A's DNA would then be available for further transfer onto an object that is touched by Person B (a cell phone, a door knob, a weapon) or even onto another location on Person B's body. For example, if Person B touched [his] face, neck, or genital area, it has been shown by Graham and Rutty and by Jones *et al.* among others that DNA can transfer from a person's hands to other areas on [his] bod[y].
>
> Secondary transfer can also occur from person to object to person. An example of this sort of transfer could be if Person A dried [his] hands on a towel, thus transferring [his] DNA to the towel (primary transfer). If Person B then used that same towel to dry [her] hands or body, [she] could inadvertently transfer some of Person A's DNA to [her] body during the drying process.

Secondary transfer of blood, saliva, vaginal secretions, and semen (as well as possibly skin cells) can also occur in the laundering process as described by Noël *et al.* and Kamphausen *et al.* (2015) who both observed transfer of body fluids onto clean clothing items during the laundering process.

Noël *et al.* found in their research that underwear of girls in volunteer family groups consistently demonstrated the presence of DNA from all members of the family, including the father, mother, and siblings. Y-STR testing would make it even more likely to detect [a] male family member's DNA on a female family member's underwear since it ignores the presence of female DNA.

In this case, since the laboratory did not analyze the underwear, it is unknown whether Lumsden's DNA is also present on [Allison's] underwear as "background" DNA from living in the same home as Lumsden and his male child. Any DNA present on [Allison's] underwear could easily transfer to her vaginal area while she was wearing the underwear. The possible low-level presence of more than one male individual at two loci could be further proof of some sort of secondary DNA transfer event.

5. Since a low amount of male DNA was detected in an excess of female DNA, Y-STR testing had to be conducted in this case in order to obtain any usable DNA results. However, Y-STR testing is different than traditional autosomal testing in that even when a full DNA profile is obtained, the lab can't identify one individual to the exclusion of all others.

Due to the paternal inheritance of the Y-chromosome, Mr. Lumsden's son (in fact, all of his paternal male relatives) would have exactly the same Y-STR profile[,] and it would be impossible to differentiate between the two individuals['] DNA based upon Y-STR testing. Considering this fact, it cannot be stated with any certainty that Lumsden's DNA is truly present in the vaginal area of [Allison]. First, only a partial profile has been obtained. If any of the 8 loci where no results were obtained happened to not be consistent with Lumsden, he would be 100% excluded as a possible contributor to the DNA profile. In addition, the DNA detected on the vaginal swab could just as easily be from a secondary transfer event involving Lumsden's son's DNA. If the two children shared a bathroom, bedroom, hamper, or other communal items[,] it would be very easy for DNA from Lumsden's son to be picked up on [Allison's] hands or clothing and be further transferred to her vaginal area.

The longer a person lives in a particular home, the more of [his] DNA we would expect to find. Touch DNA can last for extended periods of time indoors with one study indicating full "touch" DNA profiles obtained up to 6 weeks after deposition (Raymond *et al.*). This was the longest time period studied, so it is quite likely, and supported by anecdotal evidence, that touch or transfer DNA can remain for even longer time periods.

6. In this case it is impossible to determine how the male DNA arrived on the vaginal area of [Allison] (primary or secondary transfer)[,] and it is impossible to determine exactly whose DNA is actually present due to the partial Y-STR profile and the paternal inheritance demonstrated with Y-STR typing. It should be noted that the probability of randomly selecting an unrelated Caucasian individual who could also be a contributor to the partial profile obtained from the vaginal swab sample is 1 in 2,457 and, if even one of the 8 loci where no results were obtained is found to be inconsistent with Mr. Lumsden's known DNA profile[,] he would be eliminated as a possible contributor to the DNA detected in this sample.

*Lumsden*, No. 02-21-00012-CR, 2021 WL 4319602, at *3-4.

In his state habeas application, Petitioner alleged trial counsel was ineffective for failing to properly request funding for Ms. Ryan to testify at trial. (Dkt. #38-12, pp. 171-72). He also complained that trial counsel's failure to file an *Ake* motion caused Petitioner to forfeit his *Ake* claim on appeal. (Dkt. #38-12, pp. 171-72). In his affidavit filed in response to Petitioner's state habeas application, trial counsel Robert John Holland addressed this claim as follows:

*(1) Whether counsel requested funding for travel for an out-of-state expert, filed any written motions regarding that request, and the circumstances surrounding the use of a specific out-of-state expert*

I timely filed a written motion for funds to retain a DNA expert and the Court approved and granted limited funds to secure a DNA expert for Mr. Lumsden. Mr. Lumsden had found a DNA expert, Ms. Ryan through his sources and demanded that we hire Ms. Ryan, in California. He provided me her contact and resume and information to contact her for the case. I sent her all the information needed and she provided me her expert opinion, which we discussed further and was discussed with Mr. Lumsden. Ms. Ryan requested additional funds if it was necessary for her to fly to Texas for testifying at the jury trial. As I had previously filed a written motion for funds to retain an expert and had obtained limited funds in a court order, during the Pre-trial hearing, I relied on my previous written motion for funds to retain an expert and asked the court for additional funds for travel of the retained DNA expert, Ms. Ryan. This Court asked if there were any DNA experts in-state, and I replied "that there were but this, is the DNA expert that Mr. Lumsden demanded we hire." I did not feel it was necessary to file a second written motion for additional funds for an expert and relied on my previous written motion for funds for an expert and made an oral motion at Pre-Trial. I have found it common practice for the local courts at the first request, to grant limited funds to retain defense assistance at trial, but with the caveat from the court, you can ask for additional funds later if needed.

I do not believe Ms. Ryan's testimony would have changed anything. Ms. Ryan was going to testify that the DNA from the SANE exam could have come from Mr. Lumsden or one of his patrilineal relatives, which was the testimony of the state's DNA expert. Since my strategy was to point the blame at the uncle, Mr. Paulson who also resided in the residence, the state's DNA expert's testimony that the DNA could have come from any of Mr. Lumsden's male relatives, two of whom resided in the residence with Mr. Lumsden, served that theory and proved that point.

I was also able to address the possibility of DNA transfer through other witnesses very thoroughly at trial. For instance, I asked several law enforcement witnesses on why they wore gloves during this or any Investigation, which they testified was to prevent DNA transfer of their own or others. I also asked about the blanket that the victim used that could have transferred DNA.

(Dkt. #38-12, pp. 284-86). Petitioner filed an unsworn declaration, stating "he did not insist" trial counsel "hire an out-of-state DNA expert," and Ms. Ryan was retained because trial counsel did not provide Petitioner "with the name(s) of any local DNA experts, so [he] had to reach out to a friend . . . who found Ms. Ryan online." (Dkt. #38-12, p. 160).

The state habeas court found trial counsel credible and Petitioner not credible (Dkt. #38-22, p. 298, ¶¶ 7, 9, p. 353) and made the following findings of fact relevant to this claim:

10.    Applicant requested that Mr. Holland hire Suzanna Ryan as their DNA expert and Mr. Holland successfully motioned this Court for $3,000 to pay for Ms. Ryan.

11.    Mr. Holland requested additional funds for Ms. Ryan's travel for trial from California, stated there were DNA experts in Texas but Applicant demanded Ms. Ryan, and this Court denied Mr. Holland's request.

12.    Ms. Ryan's report stated that Applicant's DNA was found on the vaginal swab of Allison,[1] there was no DNA found on the anal swab of Allison, Allison's underwear was not tested for DNA, and the DNA could have been from a secondary transfer onto Allison's vagina.

[FN1] This Court uses the Second Court of Appeals pseudonyms given to the victim, the victim's mother, and all minors. *See* Tex. R. App. P. 9.10(a)(3).

13.    Christina Capt was the State's DNA expert.

14.     Ms. Capt[] testified that a person can leave behind touch DNA and that touch DNA only transfers a small amount of DNA.

15.     Ms. Capt testified that no semen was found on any of the materials and found Applicant's DNA on Allison's vaginal swab.

16.     Ms. Capt testified that DNA transfer from using a shared towel would be an extreme example of a transfer of touch DNA.

17.     The SANE nurse, Deputy Gilberto Velo, Deputy Maurice Floyd, and Investigator Ashleigh Berg testified that DNA can be transferred through touch.

18.     In his closing statement, Mr. Holland argued the reliability of Ms. Capt's DNA testimony and the possibility that Troy Paulson committed the assault.

19.     Most of Ms. Ryan's possible testimony was presented through other witnesses.

20.     Ms. Ryan agreed with Ms. Capt that Applicant's DNA was found on the vaginal swab.

21.     Ms. Ryan stated in her report that she could not confirm the samples tested were from Allison, however the chain of custody of the samples was proven at trial, which showed that the samples came from Allison.

22.     Ms. Ryan stated in her report that the samples were not tested for saliva and saliva could have been used in the assault, however the use of saliva was speculation since there was no evidence that any saliva was used during this offense.

23.     Ms. Ryan stated in her report that the DNA found in the vaginal swab could have innocently been placed on Allison's underwear and then innocently transferred to Allison's vagina, and therefore Allison's underwear should have been tested for DNA.

24.     However, testing of Allison's underwear was already litigated and denied in Applicant's chapter 64 motion for DNA testing.

25.     Further, if Allison's underwear was tested and Applicant's DNA was found on Allison's underwear it would have likely not been exculpatory but instead more evidence of Applicant's guilt.

26.     The jury was presented with evidence of how touch DNA is transferred and there was evidence that Applicant touched Allison's vagina.

(Dkt. #13-22 pp. 298-301, 353).

The state habeas court made the following conclusions of law based on the parties' filings, the attached exhibits to the filings, the court's personal recollection in presiding over the criminal case, and the pertinent law (Dkt. #38-22, p. 307, ¶ 1):

> 2.   Applicant has not shown deficient performance for not filing an *Ake* motion because Applicant has not shown that denying such a motion would have been error, and, regardless, Applicant has not shown he was prejudiced by any alleged deficient performance, therefore Applicant's first ground should be denied. *See Dunning v. State*, 572 S.W.3d 685, 693-94, 696-98 (Tex. Crim. App. 2019); *Ex parte Flores*, 387 S.W.3d 626, 634 (Tex. Crim. App. 2012); *Ex parte Jimenez*, 364 S.W.3d 866, 876-88 (Tex. Crim. App. 2012); *Ex parte Martinez*, 330 S.W.3d 891, 900-01 (Tex. Crim. App. 2011); *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002); *Griffith v. State*, 983 S.W.2d 282, 286 (Tex. Crim. App. 1998).

(Dkt. #38-22, pp. 308, 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the state court findings. Trial counsel successfully secured funding to pay for Ms. Ryan as the defense DNA expert and requested additional funds for her travel to testify at trial, but that request was denied. Although trial counsel did not make a proper written *Ake* motion and preserve the issue for appeal, Petitioner has not shown that but for this alleged failure, the result of the proceedings, at trial or on appeal, would probably have been different. The state court found Petitioner failed to demonstrate that denial of an *Ake* motion would have been in error. Petitioner has not demonstrated the substantial need for Ms. Ryan's expert testimony, without which the fundamental fairness of his trial was called into question. Indeed, Petitioner has made no showing—let alone set forth any allegations explaining—in what manner he was harmed when Ms. Ryan's testimony was not presented. As reflected in Ms. Ryan's report

and as found by the state court, the majority of Ms. Ryan's proposed DNA testimony was provided through the State's DNA expert and other witnesses. Petitioner has not shown that he would not have been convicted if Ms. Ryan had testified. The record contains other substantial evidence of guilt beyond the DNA evidence. Petitioner has failed to establish the state court's determination— that Petitioner was not prejudiced by trial counsel's failure to file an *Ake* motion and preserve error on his *Ake* claim—was a wholly unreasonable factual determination in light of the evidence before it and an unreasonable application of the prejudice prong of the *Strickland* analysis. Thus, Claim 1 should be denied.

### 2. Failing to Preserve Objections Based on Speculation (Claim 2)

Petitioner argues trial counsel provided ineffective assistance by failing to preserve for appeal objections to speculative testimony. (Dkt. #17-2, p. 6).

The background for this claim is set out in the Second Court of Appeals' opinion on direct appeal:

> During the trial, which took place a year and a half after the incident, Allison was asked to look around the courtroom and see if Lumsden was present. Allison testified that she did not see him. Allison was asked to look around the courtroom one more time and see if Lumsden was present, but she said that she did not see him; the record reflects that Lumsden was present in the courtroom at that time. During Deleon's testimony, the State asked:
>
> > Q. Marco, in your training and experience, would it be uncommon for an eight-year-old abuse victim to be terrified to look her abuser in the face and identify him?
> >
> > [DEFENSE COUNSEL]: Objection to speculation, Your Honor.
> >
> > THE COURT: Overruled.
> >
> > A. In my training, no, that would not -- that would be fearful for a child.
> >
> > Q. That would be -- that would be common for a child to be fearful to look at her [abuser] in the face in open court and point them out?

A. Absolutely.

*Lumsden*, 564 S.W.3d at 892. On direct appeal, Petitioner argued the trial court reversibly erred by allowing Investigator Deleon to speculate that it "would be fearful for a child" to look her abuser in the face and identify him. *Id.* The Second Court of Appeals concluded Petitioner failed to preserve this issue and overruled it:

> To preserve error, a party must continue to object each time the objectionable evidence is offered. *See Geuder*, 115 S.W.3d at 13; *Martinez*, 98 S.W.3d at 193. A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010), *cert. denied*, 562 U.S. 1142, 131 S.Ct. 905, 178 L.Ed.2d 760 (2011); *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).
>
> As set forth above, after Deleon provided his answer to the objected-to question, Lumsden did not request a running objection, nor did he request a hearing outside the presence of the jury so that he would not have to continuously object. When the State followed up by asking Deleon a question almost identical to the initial objected-to question, Lumsden did not object. Because Deleon's answer to the second question was received without objection, Lumsden failed to preserve error. *See* Tex. R. App. P. 33.1(a); *Ethington v. State*, 819 S.W.2d 854, 859-60 (Tex. Crim. App. 1991) (holding that appellant's objection to the first question asked of witness did not preserve error as to the following three pages of questions and answers on the same subject when appellant failed to obtain a running objection or request a hearing outside the presence of the jury so that he would not have to keep objecting).

*Id.* at 892-93.

In his state habeas application, Petitioner alleged trial counsel was ineffective for failing to continuously object or request a running objection to Investigator Deleon's testimony in order to preserve the issue for appeal. (Dkt. #38-12, pp. 173-74). In his affidavit filed in response to Petitioner's state habeas application, trial counsel addressed this claim as follows:

> *(2) Whether counsel continued to object to Deputy Marco Deleon's testimony about the Victim being afraid of Applicant and the circumstances surrounding any lack of an objection*

> The victim could not identify Mr. Lumsden in front of the jury. Everyone in the courtroom understood that she could not identify Mr. Lumsden. I was not going to harp on this issue when it was understood. I did not want to keep objecting because the state could make any excuse they wanted, but the victim could not point out Mr. Lumsden, which was obvious to all. I did not want to offend the Jury or . . . lose the Jury or have them turn on me, this early at trial. I wanted them to have confidence in me, and I did not want to continually object when the Jury witnessed that the victim obviously could not point out Mr. Lumsden.

(Dkt. #38-12, pp. 286-87).

After finding trial counsel credible (Dkt. #38-22, p. 298, ¶ 7, p. 353), the state habeas court

made the following findings of fact relevant to this claim:

27.  Allison told several people and testified that Applicant was the person who sexually assaulted her, but Allison could not identify Applicant in-person in the open court, despite evidence that Applicant looked the same as he did in 2015.

28.  Several other witnesses identified Applicant in-person in the courtroom.

29.  Investigator Marco Deleon was a sexual assault investigator who was certified through the State of Texas and had specialized training in investigating sexual assaults and family violence, including offenses against children.

30.  Mr. Holland objected to the State asking Investigator Deleon if it was common for a child to be scared to look her abuser and identify him, this Court overruled that objection, Investigator Deleon testified it would be fearful for a child, the State then immediately asked again if it would be fearful for a child to point to her abuser in court, and Investigator Deleon testified it would.

31.  Mr. Holland's trial strategy was not to continually object since it was obvious to the jury that Allison could not identify Applicant.

(Dkt. #38-22, pp. 301-02, 353).

The state habeas court made the following conclusions of law based on the parties' filings,

the attached exhibits to the filings, the court's personal recollection in presiding over the criminal

case, and the pertinent law (Dkt. #38-22, p. 307, ¶ 1):

3.    Applicant has not shown that he received deficient performance of his trial counsel because it is not deficient performance to not make a frivolous objection to admissible testimony, there was a sound trial strategy behind not continuously objecting to questioning regarding Allison's inability to identify Applicant at trial, and, regardless, Applicant has not shown he was prejudiced by any failure to make repeated objections to Investigator Deleon's testimony about Allison's fearfulness, therefore Applicant's second ground of error should be denied. *See Rhomer v. State*, 569 S.W.3d 664, 669-70 (Tex. Crim. App. 2019); *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Wolfe v. State*, 509 S.W.3d 325, 335-36 (Tex. Crim. App. 2017); *Jimenez*, 364 S.W.3d at 887; *Martinez*, 330 S.W.3d at 901; *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009); *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 528 (Tex. Crim. App. 2006); *Bone*, 77 S.W.3d at 833; *Mitchell*, 68 S.W.3d at 642; *Solomon v. State*, 49 S.W.3d 356, 364-65 (Tex. Crim. App. 2001); *Fairow v. State*, 943 S.W.2d 895, 899-900 (Tex. Crim. App. 1997); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g); *Guzman v. State*, 539 S.W.3d 394, 409 (Tex. App.-Houston [1st Dist.] 2017); *Roberts v. State*, No. 08-19-00029-CR, 2019 Tex. App. LEXIS 11143, at *7-9, 13-14, 2019 WL 7046756 (Tex. App.-El Paso Dec. 23, 2019) (not designated for publication); *Tucker v. State*, No. 02-15-00363-CR, 2016 Tex. App. LEXIS 13625, at *23-24, 2016 WL 7405802 (Tex. App.-Fort Worth Dec. 22, 2016) (mem. op., not designated for publication); *Carell v. State*, No. 11-13-00220-CR, 2015 Tex. App. LEXIS 7900, 2015 WL 4722237, at *4 (Tex. App.-Eastland July 30, 2015, pet. re'd) (mem. op., not designated for publication); Tex. R. Evid. 701, 702; Tex. R. App. P. 44.2; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

(Dkt. #38-22, pp. 308-10, 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

A failure to object does not constitute deficient representation unless a sound basis exists for objection. *See Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) ("[C]ounsel is not required to make futile motions or objections." (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)); *Green*, 160 F.3d at 1037 (failure to make frivolous objections does not cause counsel's performance to fall below an objective level of reasonableness); *Emery v. Johnson*, 139 F.3d 191,

198 (5th Cir. 1997) (a futile or meritless objection cannot be grounds for a finding of deficient performance); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Even with a sound basis, however, an attorney may render effective assistance despite a failure to object when the failure is a matter of trial strategy. *See Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) (noting a failure to object may be a matter of trial strategy as to which courts will not second guess counsel). Indeed, the Fifth Circuit has "recognized that deciding whether to object before a jury is a quintessential matter of trial strategy not to be second-guessed." *Thomas v. Thaler*, 520 Fed. Appx. 276, 281 (5th Cir. 2013). Furthermore, a determination of ineffectiveness depends on whether an objection would have been sustained had it been made. *United States v. Oakley*, 827 F.2d 1023, 1025 (5th Cir. 1987).

Petitioner has failed to establish the state court's conclusion that trial counsel was not ineffective for continuously objecting to Investigator Deleon's testimony about the victim's fearfulness was an unreasonable application of, or contrary to, *Strickland*. Petitioner has not overcome the presumption that trial counsel's decision not to continue objecting to Investigator Deleon's testimony as speculative and pressing the issue was reasonable trial strategy. As trial counsel explained in his affidavit, he chose not to continuously object because he believed it might offend the jury and cause them to lose confidence in him when the jury "witnessed that the victim obviously could not point out" Petitioner in the courtroom. (Dkt. #38-12, pp. 286-87). "[E]xcessive superficial objections usually annoy the jury more than the objectionable material is actually probative." *Carney v. Dir., TDCJ-CID*, No. 4:19-CV-996-P, 2021 WL 842124, at *6 (N.D. Tex. Mar. 5, 2021). Petitioner has not shown that but for trial counsel's failure to continuously object, the result of the proceedings, at trial or on appeal, would probably have been different. Any further

objection made by trial counsel on speculation grounds likely would have been futile given the trial court previously had overruled the same objection,[7] and "counsel is not required to make futile motions or objections." *Koch*, 907 F.2d at 527; *see also Sones*, 61 F.3d at 415 n.5 (counsel cannot be deficient for failing to press a frivolous point). Moreover, the record contains substantial evidence of guilt. Having not shown deficient performance or prejudice under *Strickland*, the state court's denial of this claim was not contrary to, or an unreasonable application of, federal law, and the claim should be denied.

### 3.  Failure to Request an Instruction to Disregard Testimony (Claim 3)

Petitioner asserts trial counsel provided ineffective assistance by failing to request an instruction to disregard testimony that the victim appeared truthful after the trial court sustained trial counsel's objection for bolstering. (Dkt. #17-2, p. 8).

Petitioner raised this claim in his state habeas application. (Dkt. #38-12, p. 175). The state court considered this claim and declined to provide any relief. Specifically, the state habeas court made the following findings of fact relevant to this claim:

32.     Investigator Deleon testified that he watched Allison's forensic interview from behind one-way glass.

33.     The State asked Investigator Deleon about his impression of Allison during the forensic interview, Investigator Deleon stated she was truthful, Mr. Holland objected, this Court sustained his objection, and Mr. Holland did not ask for an instruction to disregard.

34.     Investigator Deleon testified that Allison was able to give details of her assault during her forensic interview, and that the details she gave were corroborated by other evidence.

35.     The evidence outside of Investigator Deleon's statement that Allison was truthful showed that Allison's account of the offense was truthful.

---

[7] The state court's determination that Investigator Deleon's testimony was admissible, based on state law, may not be disturbed. *See Charles v. Thaler*, 629 F.3d 494, 500-01 (5th Cir. 2011).

36. Allison's testimony was consistent from the night of the offense until her testimony, and was corroborated by physical evidence and a letter she wrote that was not introduced at trial.

37. Allison is credible.

(Dkt. #13-22, pp. 302-03, 353).

The state habeas court made the following conclusions of law based on the parties' filings, the attached exhibits to the filings, the court's personal recollection in presiding over the criminal case, and the pertinent law (Dkt. #38-22, p. 307, ¶ 1):

4. Applicant's third ground should be denied regarding Mr. Holland's failure to ask for an instruction to disregard because Applicant has not shown by a probability sufficient to undermine the confidence in the outcome of trial that, but for his counsel's alleged unprofessional errors, the result of the proceeding would have been different, and he has not shown he was prejudiced. *See Strickland*, 466 U.S. at 700; *Bone*, 77 S.W.3d at 833; *Mitchell*, 68 S.W.3d at 642.

(Dkt. #38-22, pp. 310, 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the presumption of correctness afforded to the factual findings by clear and convincing evidence. Petitioner also has failed to show trial counsel's decision not to request an instruction to disregard Investigator Deleon's testimony that the victim was truthful was so ill-chosen that it permeated the entire trial with obvious unfairness. *See Mosley v. Quarterman*, 306 F. App'x 40, 48 (5th Cir. 2008) (counsel's failure to obtain a limiting jury instruction was reasonable trial strategy, and thus did not amount to ineffective assistance of counsel, where counsel's decision not to obtain a limiting jury instruction was made after some deliberation, based upon counsel's belief that juries did not generally understand a limiting instruction, and, instead, could believe counsel was trying to hide something). The record reflects trial counsel had

effectively discredited Investigator Deleon's testimony through a successful objection; arguably, trial counsel could have determined a request for an instruction to disregard such testimony would have further emphasized this testimony. Assuming, however, trial counsel rendered deficient performance for failing to request an instruction to disregard Investigator Deleon's testimony that the victim was truthful, Petitioner has not shown he was prejudiced by this testimony. Beyond Investigator Deleon's statement regarding the victim's truthfulness, the record contains other substantial evidence corroborating the victim's allegations, as detailed by the state court. Having not shown deficient performance or prejudice under *Strickland*, the state court's denial of this claim was not contrary to, or an unreasonable application of, federal law, and the claim should be denied.

### 4. Failure to Object to Jury Seeing Petitioner in Custody (Claim 4)

Petitioner argues trial counsel provided ineffective assistance by failing to object to the jury seeing Petitioner in custody during trial. (Dkt. #17-2, p. 10). Petitioner alleges that after *voir dire* was concluded and the jury was leaving the courtroom, they witnessed Petitioner "being escorted in shackles in a hallway by Sheriff Deputies," and that during trial, he "was forced to wear his large jail bracelet, exposed to the jury, while deputies were seated directly behind [him] as security." (Dkt/ #17-2, p. 10).

Petitioner raised this claim in his state habeas application. (Dkt. #38-12, p. 177). In his unsworn declaration, Petitioner stated, "I was . . . made to stand trial wearing my Denton County jail bracelet, and jurors saw me in sheriff's officers' custody in the courthouse." (Dkt. #38-12, p. 160). Trial counsel addressed Petitioner's claim in his affidavit submitted in response to Petitioner's state habeas application as follows:

*Whether Applicant's jail bracelet or him being in the custody of the sheriff's office was an issue at trial and why there was not an objection regarding the bracelet or custody*

I do not remember any issue with the bracelet or Mr. Lumsden being in custody. Mr. Lumsden was in a suit for trial. I make a point to inform clients that they will be at the table with me and there should be no indication that they are in custody. I instruct clients that the Jury should never be aware that the client is in police custody. I would have objected if there was any indication that Mr. Lumsden was in custody, as I have made such objections in the past. I am especially cognizant of this issue and pay special attention to whether my clients are shown to be in custody in front of the jury.

(Dkt. #38-12, p. 287).

The state habeas court found trial counsel credible and Petitioner not credible (Dkt. #38-22, p. 298, ¶¶ 7, 9, p. 353) and made the following findings of fact relevant to this claim:

38.    There is no evidence in the record that the jury was aware of Applicant's jail bracelet or aware that he was in the custody of the Denton County Sheriff Deputies.

39.    Applicant was in a suit throughout trial.

40.    In his normal practice, Mr. Holland is cognizant of whether his clients are seen in jail attire in front of the jury, informs his clients that there should be no indication that his client is in custody, and objects when there is an indication that his client is in custody.

41.    Had there been an indication that Applicant was in custody, Mr. Holland would have objected during Applicant's trial.

(Dkt. #13-22, pp. 303, 353).

The state habeas court made the following conclusions of law based on the parties' filings, the attached exhibits to the filings, the court's personal recollection in presiding over the criminal case, and the pertinent law (Dkt. #38-22, p. 307, ¶ 1):

5.    Applicant's fourth ground should be denied because Mr. Holland did not provide deficient performance by not objecting to Applicant's jail bracelet or that he was in custody where there was no indication that the jury was aware of Applicant's custody, thus any objection would have been frivolous, and, regardless, even if Mr. Holland should have objected,

43

> Applicant has not proven he was prejudiced by any alleged error. *See Martinez*, 330 S.W.3d at 901; *Bone*, 77 S.W:3d at 833; *Mitchell*, 68 S.W.3d at 642; *Guzman*, 539 S.W.3d at 409; *Manning v. State*, 864 S.W.2d 198, 204 (Tex. App.-Waco 1993, pet. ref'd); *Garcia v. State*, 634 S.W.2d 888, 893 (Tex. App.-San Antonio 1982, no pet.).

(Dkt. #38-22, pp. 310-11, 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the presumption of correctness afforded to the factual findings by clear and convincing evidence. Petitioner has failed to prove the factual foundation of his claim—that the jury observed him in custody. Because there was no evidence that the jury saw Petitioner in custody—beyond Petitioner's unsubstantiated assertion, which the state court did not find credible—there was no basis for trial counsel to object. Counsel is not required to make futile objections. *Koch*, 907 F.2d at 527. Petitioner has also failed to show that either the state court adjudication was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the state court adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, Claim 4 should be denied.

### 5. Failing to Introduce CPS Records (Claim 5)

Petitioner contends trial counsel provided ineffective assistance by failing to introduce CPS records. (Dkt. #17-2, p. 16). Petitioner alleges the CPS records contained the following "exculpatory, mitigating, and impeaching evidence": the victim "repeatedly affirmed" she had never seen Petitioner's penis, "undercutting" the SANE nurse's testimony that the [victim] said

Petitioner 'was twirling his penis and asking [the victim] to touch it'"; and the victim's mother had a drug and alcohol problem. (Dkt. #17-2, p. 16).

In his state habeas application, Petitioner argued trial counsel provided ineffective assistance by failing to submit an open-records request for CPS records and that had he submitted such request, he would have discovered the evidence described above.[8] (Dkt. #38-12 p. 179). In his affidavit filed in response to Petitioner's state habeas application, trial counsel addressed the claim as follows:

> *CPS Records*
>
> I do not remember if I got an actual copy of the documents, but I believe the state at least provided the CPS records for my review. In regards to whether the victim saw Mr. Lumsden's penis, I do not recall the SANE nurse saying that the victim said his penis was out. I do not remember that being an issue. The victim's father in Utah thought that the victim's mother was possibly using drugs, but I do not remember any other allegations that she was using drugs. As I remember it, Mr. Lumsden had just gone through custody proceedings regarding his children and he would have had to say that the victim's mother was clean in order to gain visitation with/custody of his children.
>
> The testimony was that the victim's mother took either pain meds or sleeping pills the night of the offense.

(Dkt. #38-12, p. 293).

The state habeas court found trial counsel credible (Dkt. #38-22, p. 298, ¶ 7, p. 353) and made the following findings of fact relevant to this claim:

> 42. The complained-of CPS records were turned over to Mr. Holland from the State.
>
> 43. At trial, there was evidence that Applicant asked Allison to touch his penis and Applicant was touching his penis during the assault, but not that Allison saw Applicant's penis.
>
> 44. The CPS records and the evidence at trial show that on the night of the offense Kelly took a muscle relaxer.

---

[8] Although Petitioner's claim in his state habeas application differs slightly from his federal habeas claim, they are similar enough that the Court considers Claim 5 to be exhausted.

45.    Kelly, David, and Investigator Deleon testified that Kelly was sick on the night of the offense and Applicant gave her a muscle relaxer.

46.    Applicant testified that Kelly was in bed when he got home, then admitted it was possible that he previously told Investigator Deleon that Kelly was downstairs when he got home, and told CPS and stated that Kelly was in bed when he got home, she got up to eat, and then she went back to bed.

47.    In the CPS records, David's father, who lived out-of-state and was in a custody dispute with Kelly, stated that he thought that Kelly was using drugs and was under the influence.

48.    CPS found no indication that Kelly was abusing drugs or alcohol.

(Dkt. #13-22, pp. 303-04, 353).

The state habeas court made the following conclusions of law based on the parties' filings, the attached exhibits to the filings, the court's personal recollection in presiding over the criminal case, and the pertinent law (Dkt. #38-22, p. 307, ¶ 1):

6.    Applicant's fifth ground should be denied because Mr. Holland did not provide deficient performance for a failure to file an open-records request for CPS records where the State provided those records to Mr. Holland, and Applicant has not shown how any of the information in the CPS records would have changed the outcome of trial, thus he was not prejudiced even if the CPS records contained the information he claims. *See Strickland*, 466 U.S. at 700; *Martinez*, 330 S.W.3d at 900; *Bone*, 77 S.W.3d at 833; *Mitchell*, 68 S.W.3d at 642.

(Dkt. #38-22, pp. 311, 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the presumption of correctness afforded to the factual findings by clear and convincing evidence. Trial counsel reviewed the CPS records and determined they did not contain information contradicting the SANE nurse's testimony or indicating the victim's mother had a drug and alcohol problem. Thus, Petitioner has failed to overcome the presumption

that trial counsel's decision not to introduce the CPS records was reasonable trial strategy. Petitioner also has failed to demonstrate he was prejudiced by trial counsel's failure to introduce the CPS records. None of the information contained in the CPS records identified by Petitioner was exculpatory or would have changed the outcome of the trial. Having not shown deficient performance or prejudice under *Strickland*, the state court's denial of this claim was not contrary to, or an unreasonable application of, federal law, and the claim should be denied.

### 6. Failure to Introduce Text Messages (Claim 6)

Petitioner contends trial counsel provided ineffective assistance by failing to introduce exculpatory text messages. (Dkt. #17-2, p. 16). Petitioner alleges the text messages showed Petitioner did not "'drug'" the victim's mother on the night of the alleged crimes, as the prosecutor had told the jury, but proved the victim's mother took medication and went to bed before Petitioner returned home from work. (Dkt. #17-2, p. 16).

Petitioner raised this claim in his state habeas application. (Dkt. #38-12, p. 181). In his affidavit filed in response to Petitioner's state habeas application, trial counsel addressed this claim as follows:

*Alleged Texts From Before the Offense*

Prior to trial, I was able to look through Mr. Lumsden's phone, specifically at his texts, content and pictures. I do not remember texts about whether the victim's mother was asleep. If there were texts that I felt would have helped the case, I would have introduced them. There were other texts I remember in this case, including texts Mr. Lumsden sent while the police were in his neighborhood where Mr. Lumsden made allegations against others, which seemed self serving at the time given the timing of the texts.

I vaguely remember the testimony of the issue whether the victim's mother was asleep or not when Mr. Lumsden got home that night. It may have been an issue if she was already asleep versus testimony Mr. Lumsden gave her sleeping pills then she went to sleep, creating an impression of his planning the bad act, however I do not believe it would have changed the outcome of trial.

(Dkt. #38-12, pp. 294-95).

The state habeas court found trial counsel credible and Petitioner not credible (Dkt. #38-22, p. 298, ¶¶ 7, 9, p. 353) and made the following findings of fact relevant to this claim:

> 49.    Applicant's phones were forensically examined.
>
> 50.    On January 15, 2015, Applicant told Kelly to take a pain pill and was interested in when Kelly was going to bed.
>
> 51.    On March 5-6, 2015, Kelly told Applicant she thought she had a kidney infection and Applicant responded that she should take a muscle relaxer.
>
> 52.    If there were texts that would have benefitted Applicant, Mr. Holland would have introduced those messages.

(Dkt. #13-22, pp. 304-05, 353).

The state habeas court made the following conclusions of law based on the parties' filings, the attached exhibits to the filings, the court's personal recollection in presiding over the criminal case, and the pertinent law (Dkt. #38-22, p. 307, ¶ 1):

> 7.    Applicant's sixth ground should be denied because the text messages Applicant alleges do not exist and because the text messages about the subject would have given credibility to the State's theory[.] Applicant has not shown that Mr. Holland provided deficient performance, and, regardless, even if the texts existed and should have been introduced at trial, Applicant has not shown that his counsel's alleged deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 700; *Martinez*, 330 S.W.3d at 900; *Bone*, 77 S.W.3d at 833; *Mitchell*, 68 S.W.3d at 642.

(Dkt. #38-22, pp. 311-12, 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner has failed to rebut the presumption of correctness afforded to the factual findings by clear and convincing evidence. Petitioner has failed to prove the factual foundation of his claim.

That is, he has not established that the exculpatory texts existed. If there were no texts, then his claim obviously fails. Trial counsel cannot be ineffective for failing to discover or present evidence that does not exist. *See Tabor v. Terrell*, No. CIV.A. 11-1116, 2011 WL 5325544, at *15 (E.D. La. Oct. 3, 2011) ("Counsel cannot be found ineffective for failing to subpoena nonexistent evidence."), *report and recommendation adopted*, No. CIV.A. 11-1116, 2011 WL 5325540 (E.D. La. Nov. 3, 2011) *Smith v. Cockrell*, No. 3-02-CV-1985-P, 2003 WL 21649942, at *3 (N.D. Tex. Jan. 29, 2003) (counsel not ineffective for failing to obtain copies of police video tapes and radio logs of the petitioner's arrest where there was no evidence in the record that these pieces of evidence ever actually existed); *see also Scruggs v. Warden, Lake Erie Corr. Inst.*, No. 1:07cv659, 2008 WL 5450607, at *3 (S.D. Ohio Dec. 31, 2008) ("A trial attorney cannot be ineffective for failure to discover evidence which does not exist."). Furthermore, the text messages that existed would not have benefited Petitioner's defense but rather would have supported the State's case. Thus, Petitioner has failed to demonstrate that, but for trial counsel's alleged error, the result of the trial would have been different. Having not shown deficient performance or prejudice under *Strickland*, the state court's denial of this claim was not contrary to, or an unreasonable application of, federal law, and the claim should be denied.

### 7. Failure to Call a Witness (Claim 7)

Petitioner alleges trial counsel provided ineffective assistance by failing to discover and call Marion Cashel as a witness to provide mitigating testimony during the punishment phase of trial. (Dkt. #17-2, p. 16). Petitioner alleges Cashel would have provided "powerful and explosive mitigating evidence that [Petitioner] had suffered extensive and atrocious abuse as a child." (Dkt. #17-2, p. 16).

49

Petitioner raised this claim in his state habeas application. (Dkt. #38-12, pp. 187-88). In his unsworn declaration filed in support of his habeas application, Petitioner stated that before trial he provided trial counsel with the names of several witnesses who could have testified favorably on his behalf during the punishment phase of trial, and trial counsel told him that his "'childhood ha[d] nothing to do with this'" and called no witnesses at the punishment phase. (Dkt. #38-12, p. 160). Petitioner submitted the affidavit of Cashel in which she averred:

1.  I was previously assigned as an in-home Aide with the Nobles County Family Services Agency in the early-mid 1980's. I worked with the family of Raymond Lumsden.

2.  Raymond Lumsden was severely abused by his step-father from age 5 until around age 15. Broken bones, black eyes, burns and hospital stays were common occurrences for Raymond. The severe and brutal beatings led to outbursts in school and home which led to Raymond being taken out of the home and placed in foster homes, group homes, juvenile facilities, etc.

3.  At around age 8, Raymond's music teacher began sexually abusing him at school which became more frequent when she moved across the street from him. At age 10, Raymond contracted a sexually transmitted disease which can only be contracted through direct intercourse. He was treated by a local doctor, who filed a report, though charges were never filed. Raymond refused to disclose the name of his abuser. Raymond told me afterward that the abuse went on until he was about 15 years old.

4.  When Raymond was 14 years old, he was seduced by a woman of age 19, who became pregnant. Raymond had a child, Anthony, when he was 15. No charges were ever filed in that case.

5.  At age 14, a woman at church sexually abused Raymond in the van used to transport the kids to church. In that case, Raymond's mom chose not to file charges because she felt that Raymond was "old enough" to stop the abuse if he so desired.

6.  Prior to Raymond's trial, I contacted his trial lawyer, John Holland, via letter and email, disclosing information to him as well as my opinion. I advised him to investigate further to understand the victimization that Raymond endured his entire childhood, from ages 3-15.

7.  Raymond, as an adult, has been an advocate for abused children, as most abused children become by statistics. He wrote a book on prevention of

child abuse, "Stronger By The Day", and donated all the funds to abused children.

8.    I was unable to travel to his trial. I was 85-years-old at the time, and offered to give my testimony via telephone if necessary. Mr. Holland did not return my email or letter, nor did he conduct any meaningful investigation that would have proven that Raymond Lumsden was himself a victim of atrocious physical, mental, sexual and emotional abuse. He is a survivor and would never harm a child.

9.    If nothing else, the jury may have assessed a much less sentence had they known of Raymond's horrible nightmare as a childhood. It was so bad, in fact, that he attempted suicide on three occasions as a child and as a teenager. Luckily, he was saved by emergency staff at the hospital, etc. He attempted suicide again in 2005 while in the Flower Mound, Texas, city jail. These events are detailed in his book.

10.    I do not believe that Raymond Lumsden is capable of harming any child.

(Dkt. #38-12, pp. 269-70).

In his affidavit filed in response to Petitioner's state habeas application, trial counsel addressed Petitioner's claim as follows:

*Whether counsel was ever contacted by Marion Cashel and/ or whether counsel's investigation of the case discovered Marion Cashel*

The court-appointed private investigator and I worked to find punishment evidence and witnesses for trial. We contacted several out-of-state witnesses before trial and provided them the trial start date. During trial, we kept all witnesses, whether local or out of state, whom stated they would willing[ly] testify for Mr. Lumsden, updated with the trial time frame. They indicated they would show up for trial to testify as needed. I believe the court even adjourned early on a Friday, at my request and gave the defense witnesses the weekend to travel to testify on the following Monday for Mr. Lumsden. However, the witnesses were no-shows on Monday, and since some were out-of-state I had less access to them. As I recall, Mr. Lumsden over that weekend, told them in fact not to come to testify for him at trial.

I do not recall or having heard of a social worker or someone named Marion Cashel. No one with that name or profession reached out to me, that I recall. I was aware that Mr. Lumsden claimed he was abused as a child and I discussed his book and allegations within it with Mr. Lumsden. As I remember Mr. Lumsden told me that he was on some kind of list to talk to children at schools about avoiding being abused, and had used the book he wrote to get into schools. Mr. Lumsden wanted a witness to testify that he spoke at schools. I contacted someone at the school and

a school representative said that Mr. Lumsden attempted to have access to and talk to children and they would not allow him to and would not allow him in the school[.]

I was in contact with Mr. Lumsden's eldest child's mother. She had a child with Mr. Lumsden when she was an adult and he was underage minor. Her and their son[] were the only persons who seemed to want to come testify at trial. She did not come to trial, possibly because her testimony would have been her admitting that she had sex with Mr. Lumsden when he was a minor and had a child together. However, overall I am not sure that her testimony would have been helpful to the case.

We also spoke with Mr. Lumsden's sister, who may have been taking care of his elderly mother at the time. My investigator and I had to track down Mr. Lumsden's mother without his help. Mr. Lumsden actually was angry with me for contacting his mother and her telling us about his childhood and past history. Mr. Lumsden got mad at me when I brought up several potential witnesses during the Investigation of the case, which had included his mother who I had contacted and I believe his sister, neither of which wanted anything to do with Mr. Lumsden or to assist him at jury trial. Mr. Lumsden expressed anger at me for contacting his mother and sister and did not want them called on his behalf at jury trial.

Mr. Lumsden claimed that his parents divorced and his mother left him on the streets. His mother said that she wanted Mr. Lumsden to come and live with her and he chose to live with his father.

We also spoke with Mr. Lumsden's previous employer, who said he would not have anything nice to say about Mr. Lumsden if he was called to testify, as Mr. Lumsden had lied in his job interview and his resume to them and did not reveal he was a convicted felon. Additionally the employer provided sexually improper photos and emails Mr. Lumsden had sent to either co-workers or clients, I do not recall now which, that showed Mr. Lumsden was not an ideal employee and which I addressed in a Motion in Limine.

(Dkt. #38-12, pp. 280-90).

The state habeas court found trial counsel credible and Petitioner not credible (Dkt. #38-22, p. 298, ¶¶ 7, 9, p. 353) and made the following findings of fact relevant to this claim:

53.    Mr. Holland does not recall Marion Cashel contacting him.

54.    Mr. Holland was in contact with other out-of-state punishment witnesses during trial.

55.    No witnesses showed up for punishment on behalf of Applicant.[]

52

56.    Applicant was uncooperative in tracking down and providing the testimony of punishment witnesses.

57.    Applicant wanted someone from a school he claimed to have presented at to testify at punishment, however, Applicant was not previously given access to the school.

58.    Applicant testified that Mr. Holland was in contact with his family and Applicant's sister was given notice of the timing of trial.

59.    Mr. Holland informed this Court that he informed Applicant's family that they would be needed as witnesses either September 15th, 16th, 19th, or 20th.

60.    Mr. Holland could not call Applicant's former employer as a punishment witness because they only had negative opinions of Applicant and evidence against Applicant.

61.    The jury heard evidence that Applicant did not have much growing up, had a rough childhood, and fathered a baby as a minor.

62.    The jury heard evidence that Applicant tried to blame others for the offense, attempted to pay off Kelly, made phone calls to try to interfere with the investigation, and was not credible.

63.    In punishment, the jury was presented with evidence unfavorable to Applicant including his criminal history, that his former victims live in fear of him, that he violated his bond, that he created false identities, that he physically assaulted his minor child and recorded her masturbating, that he had a history of grooming children, that he had a history of being physically and verbally abusive to women, that he assaulted pregnant women, that he was a difficult probationer, that he told Kelly not to stop having sex with him when his youngest daughter walked in on he and Kelly having sex, and Allison's issues with being sad, being afraid, and having low self-esteem after the offense.

64.    Ms. Cashel stated that she would have testified about how Applicant was abused as a child and that Applicant would never and was not capable of harming a child.

. . . .

67.    Mr. Holland found Applicant to be uncooperative and unwilling to communicate, and believed Applicant was listening to the advice of others during trial.

(Dkt. #13-22, pp. 305-07, 353).

The state habeas court made the following conclusions of law based on the parties' filings, the attached exhibits to the filings, the court's personal recollection in presiding over the criminal case, and the pertinent law (Dkt. #38-22, p. 307, ¶ 1):

> 10.  Applicant's ninth ground should be denied because Mr. Holland did not provide deficient performance at the punishment phase of trial where Mr. Holland attempted to find punishment witnesses for Applicant and was never contacted by Ms. Cashel, and regardless, Applicant has not shown that Ms. Cashel's testimony would have been of some benefit to the defense given the unfavorable evidence against Applicant or that there were any other witnesses or evidence that should have been presented at the punishment phase. *See Martinez*, 330 S.W.3d at 900; *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004); *Bone*, 77 S.W.3d at 833; *Mitchell*, 68 S.W.3d at 642.

(Dkt. #38-22, pp. 312-13, 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

In the state sentencing context, the relevant *Strickland* prejudice prong inquiry is whether, absent counsel's errors, there is a reasonable probability the defendant's sentence would have been "significantly less harsh," *Spriggs v. Collins*, 993 F.2d 85, 88-89 (5th Cir. 1993), taking into account "such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances." *United States v. Segler*, 37 F.3d 1131, 1136 (5th Cir. 1994) (citing *Spriggs*, 993 F.2d at 88);[9] *accord Dale v. Quarterman*, 553 F.3d 876, 880 (5th Cir. 2008).

---

[9] The *Spriggs* "significantly less harsh" standard applies here because Petitioner's habeas petition alleges ineffective assistance of counsel during a state sentencing hearing, not a federal one. *United States v. Grammas*, 376 F.3d 433,

Additionally, "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978). Further, the presentation of witness testimony is essentially strategy and, thus, within the trial counsel's domain. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). A habeas petitioner must overcome a strong presumption counsel's decision in not calling a particular witness was a strategic one. *See Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984). In order for a petitioner to demonstrate the requisite *Strickland* prejudice, the petitioner must show not only that the witness would have testified at trial but also that this testimony would have been favorable. *Alexander*, 775 F.2d at 602 (citing *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981)); *see also Gomez v. McKaskle*, 734 F.2d 1107, 1109-10 (5th Cir. 1984).

Moreover, although it is well settled that to render effective assistance, "counsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary," the reasonableness of an investigation depends in part on the information supplied by the defendant. *See, e.g., Ransom v. Johnson*, 126 F.3d 716, 723 (5th Cir. 1997); *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985); *Martin v. Maggio*, 711 F.2d 1273, 1280 (5th Cir. 1983). "'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . In particular, what investigation decisions are reasonable depends critically on such information.'" *Boyd v. Johnson*, 167 F.3d 907, 910 (5th Cir. 1999) (quoting *Strickland*, 466 U.S. at 691).

Petitioner has failed to rebut the presumption of correctness afforded to the factual findings by clear and convincing evidence. The record demonstrates trial counsel investigated and

---

438 & n.4 (5th Cir. 2004) (holding *Glover v. United States*, 531 U.S. 198, 203 (2001), which cites *Spriggs*, abrogates the significantly harsh test only in the federal sentencing context). *See also Dale*, 553 F.3d at 880 n.2.

contacted potential witnesses and arranged for certain witnesses to testify at the punishment phase of trial, but they failed to show. There is no evidence Cashel contacted trial counsel or that Petitioner told trial counsel about Cashel, beyond Petitioner's unsubstantiated declarations, which the state court did not find credible. In assessing trial counsel's investigation decisions, what Petitioner told trial counsel is critical. *Strickland*, 466 U.S. at 691. If Petitioner did not inform trial counsel of the identity of Cashel, trial counsel's performance cannot be deficient. In other words, trial counsel must have a reason to look for witnesses. He cannot be faulted for not looking for someone he does not know may exist. Petitioner has failed to show the state court acted unreasonably in determining trial counsel's performance during the punishment phase of trial did not fall below an objective standard of reasonableness. Furthermore, Petitioner has failed to show the state court acted unreasonably in determining his sentencing would have been different had Cashel or some other witness had testified. Specifically, Cashel's affidavit does not create a reasonable probability that a jury would have given Petitioner a significantly less harsh sentence had Cashel testified. Therefore, Petitioner is not entitled to habeas relief on Claim 7, and the claim should be denied.

### 8. Ineffective Assistance of State Habeas Counsel (Claim 19)

Petitioner argues state habeas counsel provided ineffective assistance by failing to allege a claim that Petitioner's appellate counsel was ineffective for failing to raise a Confrontation Clause claim. (Dkt. #17-2, p. 20). A claim of ineffective assistance of habeas counsel is not cognizable in federal habeas proceedings. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) ("Ineffectiveness of post-conviction counsel cannot be the grounds for federal habeas

relief."); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004) (complaints of denial of effective assistance of counsel during state post-conviction proceeding did not furnish a basis for federal habeas relief); *Henderson*, 333 F.3d at 606 (complaints of ineffective assistance by state habeas counsel did not furnish a basis for federal habeas relief). Therefore, Claim 19 should be denied as not cognizable on federal habeas review.

### 9. Cumulative Error (Claims 8 and 24)

Petitioner alleges cumulative error based on the ineffective assistance of trial counsel, appellate counsel, and state habeas counsel (Claim 8). (Dkt. #17-2, p. 17). In a related claim, Petitioner argues the state court's ruling that trial counsel was not "cumulatively ineffective" conflicts with clearly established Supreme Court precedent (Claim 24).[10] (Dkt. #17-2, p. 22).

In his state habeas application, Petitioner raised a cumulative error claim but only with respect to trial counsel's alleged ineffective assistance.[11] (Dkt. #38-12, p. 183). The state habeas court rejected the claim, concluding there was no cumulative error because none of Petitioner's ineffective assistance of trial counsel claims had merit. (Dkt. #38-22, p. 312, ¶ 8, p. 353). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court without a hearing and on the TCCA's independent review of the record, which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

---

[10] The Court construes Claim 24 in conjunction with Claim 8.

[11] The portion of Petitioner's cumulative error claim based on allegations of appellate counsel's ineffective assistance is unexhausted and would now be considered procedurally barred in state court under the state abuse-of-the-writ doctrine. *See Coleman*, 501 U.S. at 735 n.1; *Canales v. Stephens*, 765 F.3d 551, 566 (5th Cir. 2014); *Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005). Petitioner cannot rely on *Martinez* and *Trevino* to overcome the procedural default of his cumulative error claim. *See Davila*, 582 U.S. at 530-31. Furthermore, Petitioner has not presented new evidence of actual innocence or that a fundamental miscarriage of justice would occur if the Court does not review the merits of the cumulative error claim based on ineffective assistance of appellate counsel. In addition, the portion of the cumulative error claim based on ineffective assistance of state habeas counsel necessarily fails because ineffective assistance of state habeas counsel is not cognizable in federal habeas proceedings. *See* 28 U.S.C. § 2254(i); *Stevens*, 618 F.3d at 502; *Elizalde*, 362 F.3d at 331; *Henderson*, 333 F.3d at 606.

As the Court has concluded that none of Petitioner's ineffective assistance of trial counsel claims are meritorious, there can be no cumulative effect. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1995) ("Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." (citing *Derden v. McNeel*, 978 F.2d 1453, 1461 (5th Cir. 1992))). Accordingly, under the deferential review encompassed by *Strickland* and the AEDPA, Petitioner's cumulative error claim based on ineffective assistance of trial counsel should be denied. *Richter*, 562 U.S at 105.

## D.  Evidentiary Challenge (Claim 23)

Petitioner asserts the Second Court of Appeals erred by ruling that Petitioner's substantial rights were not violated when the trial court allowed a forensic video interview of the victim to be played to the jury for a second time. (Dkt. #17-2, p. 22).

As previously mentioned, Alvarado testified that during her forensic interview with the victim, the victim said that Petitioner had "done this to her." *Lumsden*, 564 S.W.3d at 870. Alvarado testified that the victim provided sensory details and peripheral details when she explained what had happened to her. *Id.* The video of the forensic interview (State's Exhibit No. 13) was played for the jury. *Id.* During jury deliberations, the jury asked to see the forensic video again (Dkt. #37-1, p. 186), and it was played for the jury a second time (Dkt. #37-8, p. 208).

On direct appeal, Petitioner argued the trial court reversibly erred by admitting the video of the forensic interview of the victim. *Lumsden*, 564 S.W.3d at 888. Petitioner contended the video contained inadmissible hearsay that was not a prior consistent statement and that its probative value was substantially outweighed by unfair prejudice. *Id.* In his appellate brief, Petitioner further asserted the record showed "one additional way in which this particular exhibit had a substantial and injurious effect or influence in determining the jury's verdict: ***the jury asked***

*to see the video* during their deliberations," which indicated "that at least some of the jurors were unconvinced by the other evidence, and the forensic interview weighed heavily in deciding their verdict." (Dkt. #37-14, p. 61). (emphasis in original).

The Second Court of Appeals addressed the issue as follows:

## VI. Evidentiary Challenges

In his fourth through tenth issues and in his twelfth issue, Lumsden challenges the trial court's rulings on objections to various testimony and to the admission of State's Exhibit Nos. 4, 13, and 30. Because these issues challenge evidentiary rulings, we set forth the applicable standard of review only once and refer to it, as necessary, in our analysis of each of these issues.

### A. Standard of Review

We review a trial court's evidentiary rulings under an abuse-of-discretion standard. *See Jenkins*, 493 S.W.3d at 607. A trial judge's decision is an abuse of discretion only when it falls outside the zone of reasonable disagreement. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App.), *cert. denied*, 549 U.S. 1024, 127 S.Ct. 564, 166 L.Ed.2d 418 (2006).

If we find error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex. R. App. P. 44.2. If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. Tex. R. App. P. 44.2(a). Otherwise, we apply rule 44.2(b) and disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be

considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

. . . .

**E. Admission of State's Exhibit No. 13**

In his seventh issue, Lumsden argues that the trial court reversibly erred by admitting State's Exhibit No. 13—the video of Alvarado's forensic interview of Allison. Lumsden contends that the video contained inadmissible hearsay that is not a prior consistent statement and that its probative value was substantially outweighed by unfair prejudice.

**1. Applicable Law**

Texas Rule of Evidence 801(e)(1)(B) gives substantive, nonhearsay status to prior consistent statements of a witness "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Tex. R. Evid. 801(e)(1)(B). Because this rule is similar to its federal counterpart, the Texas Court of Criminal Appeals has looked to the analysis provided in federal decisions. *See Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007).

The United States Supreme Court has explained the four requirements that must be met for prior consistent statements to be admissible under the federal counterpart:

> (1) the declarant must testify at trial and be subject to cross-examination;
>
> (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent;
>
> (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and[ ]
>
> (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*Id.* (citing *Tome v. United States*, 513 U.S. 150, 156-58, 115 S.Ct. 696, 700-02, 130 L.Ed.2d 574 (1995) ). The rule sets forth a minimal foundation requirement of an implied or express charge of fabrication or improper motive. *Id.* In any event, "there need be only a suggestion that the witness consciously altered his testimony in order to permit the use of earlier statements that are generally consistent with the testimony at trial." *Id.* (citation omitted). The fact that "there need be only a suggestion" of conscious alteration or fabrication gives the trial court substantial

discretion to admit prior consistent statements under the rule. *Id.* Thus, the court of criminal appeals has noted

> that a reviewing court, in assessing whether the cross-examination of a witness makes an implied charge of recent fabrication or improper motive, should focus on the "purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court." Courts may also consider clues from the voir dire, opening statements, and closing arguments. From the totality of the questioning, giving deference to the trial judge's assessment of tone, tenor, and demeanor, could a reasonable trial judge conclude that the cross-examiner is mounting a charge of recent fabrication or improper motive? If so, the trial judge does not abuse his discretion in admitting a prior consistent statement that was made before any such motive to fabricate arose.

*Id.* at 808-09 (internal citations omitted).

## 2. Relevant Portion of the Record

During cross-examination of Deputy Floyd, Lumsden asked about the effect of asking a child leading questions:

> Q. What are the concerns if somebody asked a child leading questions where the child just answers yes or no? What's your understanding of what that can lead to, or inaccurate answers? Is that -- is that kind of what it leads to is some inaccurate answers?
>
> A. Based on the questions that are being asked.
>
> Q. Okay. And . . . if you just are asking a child and they just have to say yes or no, that may not tell the whole story. Is that fair to say?
>
> A. That's fair.
>
> Q. And sometimes that's -- an adult can put words in a child's mouth if they ask a leading question and the child just has to answer yes or no. Is that fair to say?
>
> A. That's fair.

Later during a hearing outside the presence of the jury, the State informed the trial court that it planned to offer the video of Allison's forensic interview into evidence, and Lumsden made a general hearsay objection. The following discussion then took place:

[THE PROSECUTOR]: Okay. Judge, I believe he has opened the door for us to get in a prior consistent statement to rebut a recent fabrication. Because he went down the line of questioning, especially with Deputy Floyd, that isn't it true that if you ask a child leading questions then this, which opens the door and leaves the impression to the jury that since, I guess, leading questions were asked that it's possible that she was fabricating her story.

I have a case. It's called *Hammons v. State*. It is 239 S.W.3d 798. In order to get in a prior consistent statement, there are four things that the Court must look at. . . .

It also states that there [are] minimal foundation requirements of an implied or express charge of fabrication, so just any -- any kind of implication that we have suggested or any kind of leading -- leading questions have suggested that -- that has tampered with her statement or that it's made her -- her statements different than what it was at the time, that will allow the Court to let the forensic interview in. . . .

The trial court asked Lumsden what his specific objection was to the forensic interview, and he replied:

One objection is hearsay. The other one is we have not opened the door. The only question we asked the mother was she asked her a yes or no question. That was really the only thing that was asked, whether she was led with any questions or not. The question that -- to Officer Floyd was a generalization of when he's working with children that sometimes you need to -- is if he's -- if the child is asked leading questions, it can lead to unreliable responses.

[THE PROSECUTOR]: Which that's my point exactly, that he's left the impression with the jury that her responses are unreliable as they were in court today is what he's saying, so that is a recent fabrication. It is implied, if not direct. As that case states, it's -- a minimal foundation has to be laid that there's any impression in front of the jury that her testimony has been somehow fabricated.

. . . .

THE COURT: And so the only prior consistent statement that you're wanting to get into is the statement from the witness that it's not fabricated? Is that what[ ] -- the video is going to purport to say?

[THE PROSECUTOR]: Right. That -- that her testimony today as to what happened is not a fabrication because she told the jury what

happened, but it left in the mind of the jury that someone asking leading questions could have fabricated her answers. And so with that, when I was asking [Allison] questions, you know, as -- as a scared witness, I was somewhat leading her, but I want to show the jury because he left that impression with them that she did have prior consistent statements.

[DEFENSE COUNSEL]: I didn't cross-examine the child witness to leave in any impression that she was fabricating any statement or had an ulterior motive or was put up to it, Your Honor, so, you know, that door would be closed there if I didn't cross-examine the child.

. . . .

THE COURT: ... [A]fter reviewing Hammons and just taking a specific look at [rule] 801, I believe that they're entitled to offer the video by virtue of the line of questioning as to saying that an adult was leading them and it would cause her to give a response. I don't know that there's any way, at least by virtue of the rules, that it should be denied. So if the objection is simply hearsay, I think that I'll overrule that objection[,] and the video can be played as a prior consistent statement of the witness.

[DEFENSE COUNSEL]: Well, unfair prejudice to the Defendant, Your Honor.

THE COURT: If it's simply a prior consistent statement, I can't find that's a [rule] 403 violation.

### 3. Analysis

Lumsden's cross-examination of Deputy Floyd did not imply that Allison had recently fabricated her statements. Rather, he intended to show that Kelly's use of leading questions the morning after the sexual assault had put words in Allison's mouth regarding the alleged perpetrator from the outset. Lumsden's trial strategy was largely focused upon convincing the jury that even though Allison may have been sexually assaulted, she had misidentified the perpetrator from the beginning, not that she changed her story later on, which is the situation to which rule 801(e)(1)(B) is intended to apply. *See Tome*, 513 U.S. at 158, 115 S.Ct. at 701; *Hammons*, 239 S.W.3d at 804; *see also Klein v. State*, 273 S.W.3d 297, 316-17 (Tex. Crim. App. 2008) (holding prior consistent statements of abuse by child complainant were admissible when child claimed during her testimony that her allegations of abuse were "improperly influenced by the State's trickery in questioning her"). The trial court therefore abused its discretion by admitting the video of the forensic interview. *See Woods v. State*, No. 02-17-00367-CR, 2018 WL 5289461, at *10 (Tex. App.—Fort Worth Oct. 25, 2018, no pet. h.) (mem. op.,

not designated for publication) (holding that trial court abused its discretion by admitting video of forensic interview because defense did not imply that victim had recently fabricated her statements).

Having found error, we proceed to a harm analysis. Because we determine that the error is not constitutional, rule 44.2(b) is applicable. Tex. R. App. P. 44.2(b). Texas courts, including this court, have repeatedly held that testimony about and recordings of a child's statements concerning a sexual crime are harmless when other, unobjected-to evidence proves the same facts. *See Matz v. State*, 21 S.W.3d 911, 912-13 (Tex. App.—Fort Worth 2000, pet. ref'd); *Stephens v. State*, Nos. 02-15-00046-CR, 02-15-00047-CR, 2016 WL 2586639, at *4 (Tex. App.—Fort Worth May 6, 2016, pet. ref'd) (mem. op., not designated for publication) (collecting cases).

The most important part of the video—Allison's description of the incident that occurred on the couch—largely resembled her in-court testimony and her descriptions as testified to by Kelly and Nurse Carriker, which are detailed above. Although Allison's description of the events in the forensic interview provided more detail than her trial testimony, it provided essentially the same story, and we find it unlikely that the jury was inclined to reject Allison's story of sexual abuse but changed its mind after hearing it again in the recording. *See Woods*, 2018 WL 5289461, at *10-11 (holding that erroneous admission of forensic interview video, in which child described abuse with more detail, was harmless); *Todd v. State*, Nos. 02-12-00114-CR, 02-12-00115-CR, 2013 WL 1457735, at *5 (Tex. App.—Fort Worth Apr. 11, 2013, pet. ref'd) (mem. op., not designated for publication) (same); *see also Shaw v. State*, 122 S.W.3d 358, 364 (Tex. App.—Texarkana 2003, no pet.) ("Because the State sufficiently proved the fact to which the hearsay relates by other competent and unobjected-to evidence . . ., we hold the admission of the hearsay constituted nonreversible error."). We hold that the admission of the video of the forensic interview does not constitute reversible error. *See Matz*, 21 S.W.3d at 912-13.

We conclude that, in the context of the entire case against Lumsden, the trial court's error in admitting the video of the forensic interview did not have a substantial or injurious effect on the jury's verdict and did not affect Lumsden's substantial rights. *See King*, 953 S.W.2d at 271. Thus, we disregard the error, *see* Tex. R. App. P. 44.2(b), and overrule Lumsden's seventh issue.[19]

> [FN19] Based on our holding—that it was error for the trial court to admit the video of the forensic interview but that the admission was harmless—we need not address Lumsden's rule 403 argument related to the admission of the video. *See* Tex. R. App. P. 47.1.

*Lumsden*, 564 S.W.3d at 880-81, 888-92. When this issue was raised to the TCCA on direct appeal (Dkt. #38-5), that court refused Petitioner's PDR (Dkt. #38-7), which, although not express, is a rejection of the claims on the merits. *See Singleton*, 178 F.3d at 384.

"[A] state defendant has no constitutional right to an errorless trial." *Bailey v. Procunier*, 744 F.2d 1166, 1168 (5th Cir. 1984) (citing *Banks v. McGougan*, 717 F.2d 186, 190 (5th Cir. 1983)). Rather, on federal habeas review, a court is limited to determining whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle*, 502 U.S. at 67-68 ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine the state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *see also Hill v. Johnson*, 210 F.3d 481, 491 (5th Cir. 2000). When a petitioner alleges a trial court error, he is entitled to federal habeas relief only if the error had a substantial and injurious effect on the verdict. *Brecht*, 507 U.S. at 637; *see also Skillern v. Estelle*, 720 F.2d 839, 852 (5th Cir. 1983). A petitioner must show that "there is more than a mere reasonable probably that [the court's error] contributed to the verdict. It must have had a substantial effect or influence in determining the verdict." *Woods v. Johnson*, 75 F.3d 1017, 1026 (5th Cir. 1996).

A federal habeas court "does not sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) (citing *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991)). A federal court "will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a 'denial of fundamental fairness' under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction." *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (internal citations omitted); *see also Little*, 162 F.3d at 862

("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.") (citing *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986)).

The state court thoroughly analyzed, explained, and applied the applicable state law to review the admission of the video of the forensic interview of the victim. After determining the trial court erred in admitting the video of the forensic interview, the state court concluded the error was harmless because "in the context of the entire case against Lumsden, the trial court's error in admitting the video of the forensic interview did not have a substantial or injurious effect on the jury's verdict and did not affect Lumsden's substantial rights." *Lumsden*, 564 S.W.3d at 892. The Court will not reexamine the state court's determinations on state law questions regarding the admissibility of evidence under state procedural rules. Moreover, Petitioner has failed to show the trial court's error in admitting the video of the forensic interview of the victim had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). As the state court found, the victim's statements in her forensic interview—although more detailed than her trial testimony—"largely resembled her in-court testimony and her descriptions as testified to by [the victim's mother] and Nurse Carriker." Petitioner has failed to satisfy his burden of proof regarding the state court findings. Furthermore, there was other compelling evidence of Petitioner's guilt beyond the forensic interview of the victim. Petitioner has failed to show the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Claim 23 should be denied.

**E.  Sufficiency of the Evidence-Criminal Solicitation of a Minor (Claims 15(c) and 27(c))**

Petitioner contends he is actually innocent of criminal solicitation of a minor because the evidence was insufficient to support his conviction[12] (Claim 15(c)). (Dkt. #17-2, p. 19). In a related claim, Petitioner argues the Second Court of Appeals erred by denying Petitioner's insufficiency of the evidence claim as to his conviction for criminal solicitation of a minor (Claim 27(c)). (Dkt. #17-2, p. 23).

Petitioner raised the sufficiency of the evidence issue on direct appeal. The Second Court of Appeals considered the issue and found the evidence to be sufficient under *Jackson*:

### III. Sufficiency of the Evidence

In his first issue, Lumsden argues that the evidence is insufficient to support his conviction for criminal solicitation of a minor.

#### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, —— U.S. ——, 136 S.Ct. 198, 193 L.Ed.2d 127 (2015). We must presume that the factfinder resolved any

---

[12] Petitioner's actual innocence claim is actually a sufficiency of the evidence argument.

conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448-49; *see Blea*, 483 S.W.3d at 33.

## B. Applicable Law

As applicable in this case, a person commits the offense of criminal solicitation of a minor if, with intent that indecency with a child be committed, he requests, commands, or attempts to induce a minor to engage in specific conduct that, under the circumstances surrounding the actor's conduct as the actor believed them to be, would constitute indecency with a child. Tex. Penal Code Ann. §§ 15.031(a), 21.11(a). However, a person may not be convicted of criminal solicitation of a minor on the uncorroborated testimony of the minor allegedly solicited "unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the minor act on the solicitation." *Id.* § 15.031(c).

The corroboration required under the criminal solicitation statute is analogous to the corroboration requirement found in the accomplice-witness statute. *Compare id.*, *with* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005); *see Richardson v. State*, 700 S.W.2d 591, 594 (Tex. Crim. App. 1985). Due to the similarities between these two statutes, the test for evaluating the sufficiency of the corroboration evidence is the same under each. *Richardson*, 700 S.W.2d at 594. In assessing the sufficiency of the evidence corroborating the victim's testimony, the test requires that we eliminate the minor victim's testimony from consideration and then determine whether there is other incriminating evidence tending to connect the accused with the crime. *Id.* The tends-to-connect standard presents a low hurdle for the State because the evidence need not directly link the accused with the crime or be sufficient in itself to establish guilt. *See Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008), *cert. denied*, 556 U.S. 1211, 129 S.Ct. 2075, 173 L.Ed.2d 1139 (2009); *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996).

## C. Analysis

Here, eliminating Allison's testimony from consideration, we conclude that the State presented other evidence that tends to connect Lumsden with the offense of criminal solicitation of a minor. Kelly noted unusual behavior and a change in Allison's demeanor when she awoke her the morning after the sexual assault. Kelly testified that when she asked Allison if she had touched Lumsden, Allison replied, "He asked me if I wanted to, but I said no." Similarly, Nurse Carriker testified that Allison told her that Lumsden wanted her to touch his private parts, but she said no. And during the forensic interview, Allison said that Lumsden had asked her to touch his pee part, but she told him no.

Additionally, Lumsden's description of what he was wearing on the night in question matched the description that Allison had given during her forensic interview. Lumsden admitted that he had given Allison red Jell-O, and the search

of Lumsden's residence revealed an empty single-serving carton of Jell-O in the trash, as well as a pillow and a blanket on the couch where Allison had slept. Lumsden's testimony, as well as David's testimony, demonstrated that there was a period of time when Lumsden was alone with Allison on the couch after David went to bed.

As the sole judge of the weight and credibility of the evidence, the jury had before it testimony from multiple individuals that Lumsden was not truthful; similarly, the jury had before it evidence that Allison was credible because her allegations of penetration by Lumsden had been corroborated with physical findings during the sexual assault examination and DNA evidence. Moreover, the testimony from Kelly, Nurse Carriker, David, Lumsden, and the investigators who searched Lumsden's residence, as well as the video of the forensic interview, tends to connect Lumsden with criminal solicitation of Allison, who was a minor. Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Lumsden solicited Allison, a minor. *See Thompson v. State*, No. 07-12-00454-CR, 2014 WL 4807581, at *4 (Tex. App.—Amarillo Sept. 19, 2014, pet. ref'd) (mem. op., not designated for publication) (holding that testimony of appellant, victim's sister, nurse examiner, and recorded conversation constituted sufficient evidence tending to connect appellant with criminal solicitation of R.S., a minor); *Lankford v. State*, 255 S.W.3d 275, 277 (Tex. App.—Waco 2008, pet. ref'd) (holding that testimony from multiple witnesses, including appellant, corroborated the solicitation).[9] We overrule Lumsden's first issue.

> [FN9] Lumsden argues that public policy considerations weigh strongly against holding that a minor complainant's own hearsay, as relayed through the testimony of other witnesses, can "corroborate" her in-court testimony for purposes of section 15.031. Because the law interpreting section 15.031's corroboration requirement is clearly established and permits the use of a victim's statements to others, we decline to overturn it on the public policy grounds advanced by Lumsden. *See, e.g.*, *Thompson*, 2014 WL 4807581, at *4 (utilizing statements victim made to her sister and to nurse examiner to corroborate solicitation offense); *Cortez v. State*, No. 13-05-00447-CR, 2006 WL 1875465, at *2 (Tex. App.—Corpus Christi July 6, 2006, pet. ref'd) (mem. op., not designated for publication) (utilizing statements victim made to his parents to corroborate offense of solicitation).

*Lumsden*, 564 S.W.3d at 874-76. When this issue was raised to the TCCA on direct appeal (Dkt. #38-5), that court refused Petitioner's PDR (Dkt. #38-7), which, although not express, is a rejection of the claims on the merits. *See Singleton*, 178 F.3d at 384.

Claims of insufficient evidence to support a conviction are reviewed under the legal-sufficiency standard set out in *Jackson v. Virginia*. This standard requires only that a reviewing court determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see also Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000); *Norris v. Davis*, 826 F.3d 821, 833 (5th Cir. 2016). This standard is applied with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Dupuy*, 201 F.3d at 589 (quoting *Jackson*, 443 U.S. at 324 n.16). As a result, a federal habeas court "may find the evidence sufficient to support a conviction even though the facts also support one or more reasonable hypotheses consistent with the defendant's claims of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991). Consideration of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of witnesses, as those determinations are the exclusive province of the factfinder. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *Marler v. Blackburn*, 777 F.2d 1007, 1012 (5th Cir. 1985). All credibility choices and conflicting inferences are to be resolved in favor of the factfinder's verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005); *United States v. Nguyen*, 28 F.3d 477, 480 (5th Cir. 1994). A federal habeas court is not authorized to substitute its interpretation of the evidence for that of the factfinder. *Marler*, 777 F.2d at 1012; *Alexander*, 775 F.3d at 598. Moreover, where a state appellate court has conducted a thoughtful review of the evidence, its determination is entitled to great deference. *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993). As stated by the Supreme Court:

> We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court

may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Ibid.* (quoting *Renico v. Lett*, 559 U.S. 766, ___, 130 S. Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

*Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

On direct appeal, the Second Court of Appeals thoroughly reviewed the evidence, properly applied the *Jackson* standard, and found the evidence was sufficient to support the jury's finding that Petitioner solicited the victim, a minor. The weight to be given the evidence and trial testimony was the sole province of the jury as the factfinder; it was not for the appellate court to reweigh the evidence. Petitioner's claim that the evidence is insufficient to support his solicitation of a minor conviction is simply a disagreement with the factfinder's resolution of alleged conflicts in the evidence, and as such, is foreclosed by settled principles of appellate review. *See United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999) (in reviewing sufficiency of the evidence, a court "must accept credibility choices that support the jury's verdict, and . . . may not reweigh the evidence."). Although the jury as the factfinder could have drawn inferences in Petitioner's favor and/or made different credibility determinations and returned a finding of not guilty, *Jackson* requires that inferences be drawn in favor of the verdict when a challenge to the sufficiency of the evidence is asserted.

Affording due respect to the role of the factfinder and the state courts, the Court finds the evidence at Petitioner's trial was not nearly sparse enough to sustain a due process challenge under *Jackson*. The evidence was sufficient under Texas law to convict Petitioner of solicitation of a minor. Above all, Petitioner has not shown the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as

determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See Williams*, 529 U.S. at 402-03; *Childress v. Johnson,* 103 F.3d 1221, 1224-25 (5th Cir. 1997). In sum, Petitioner has failed to show the state court decisions were objectively unreasonable. *See Johnson*, 566 U.S. at 651. Accordingly, Claims 15(c) and 27(c) should be denied.

## F.  <u>Errors on Habeas Review (Claim 26)</u>

Petitioner asserts the state habeas court and the TCCA erred by adopting the State's proposed findings and conclusions denying Petitioner's state habeas application. (Dkt. #17-2, p. 23).

As best the Court can tell, Petitioner's claim is essentially challenging defects in his state habeas proceedings. It is well established that defects on state habeas review are not grounds for federal habeas relief. *See Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992); *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself." (internal quotation marks and citations omitted)). In this regard, Petitioner's claim that the state habeas court and the TCCA adopted the State's proposed findings of fact and conclusions of law fails under Fifth Circuit precedent. *See Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (holding infirmities in state habeas proceedings do not constitute grounds for relief in federal court); *Parrott v. Davis*, No. CV H-13-1052, 2017 WL 2336042, at *8 (S.D. Tex. May 30, 2017) (claims regarding errors on habeas review fail to state a cognizable federal claim for habeas relief). Thus, Claim 26 should be denied as not cognizable on federal habeas review.

## V.  CONCLUSION

Petitioner has failed to show he is entitled to habeas relief. Specifically, Petitioner's claims are either procedurally barred from federal habeas review, not cognizable on federal habeas review, or without merit. Notably, Petitioner has failed to demonstrate trial counsel rendered ineffective assistance under *Strickland*, has failed to show the trial court's error in admitting the video of the forensic interview of the victim had a substantial and injurious effect or influence in determining the jury's verdict, and has failed to demonstrate the evidence was insufficient under Texas law to support a finding that Petitioner solicited a minor. Above all, Petitioner has failed to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *Williams*, 529 U.S. at 402-03, 405-06; *Childress*, 103 F.3d at 1224-25. In sum, Petitioner has not shown there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Accordingly, Petitioner's amended habeas petition should be denied and dismissed.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Court of Appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). Although Petitioner has not yet filed a notice of appeal, it is respectfully recommended that the Court, nonetheless, address whether Petitioner would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (holding a district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a

substantial showing of a denial of a constitutional right on the issues before that court," noting "[f]urther briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a substantial showing of the denial of a constitutional right in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). When a district court denies a motion on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, it is respectfully recommended reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is respectfully recommended the Court find Petitioner is not entitled to a certificate of appealability.

## VII.  RECOMMENDATION

It is recommended the above-styled petition filed under 28 U.S.C. § 2254 be denied and the case be dismissed with prejudice. It is further recommended a certificate of appealability be denied.

Within fourteen days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**So ORDERED and SIGNED this 11th day of May, 2024.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE